Kenyon F. BALLEW, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. 72–283–H.

United States District Court,
D. Maryland.

Feb. 7, 1975.

John T. Bonner, Silver Spring, Md., for plaintiff.

J. Charles Kruse and David B. Waller, U. S. Dept. of Justice, Washington, D. C., and George Beall, U. S. Atty., and James E. Anderson, Asst. U. S. Atty., Baltimore, Md., for defendant.

ALEXANDER HARVEY, II, District Judge:

In this civil action, plaintiff is suing the United States under the Federal Tort Claims Act [1], seeking damages for personal injuries sustained by him when he was shot while federal agents and county police officers were attempting to conduct a search of his apartment, pursuant to a search warrant issued by a United States Magistrate. By agreement of the parties, a trial has been held first in this case solely on the issue of liability, with the issue of damages reserved for later trial, if necessary.

Armed with a search warrant issued by a United States Magistrate, a team consisting of agents of the Alcohol, Tobacco and Firearms Division of the Department of the Treasury (ATFD) and officers of the Montgomery County and Prince George's County Police Departments went to plaintiff's apartment in Silver Spring, Maryland, on June 7, 1971. The federal agent who was in charge of the operation, Marcus J. Davis, had submitted an affidavit to the Magistrate, stating that he had reason to believe that there was then being concealed in plaintiff's apartment hand grenades which were not registered as required by law.[2] Although there were indications that someone in the apartment was aware of the presence of the law enforcement officers seeking en-

---

1. 28 U.S.C. §§ 2671–2680.

2. Provisions of the National Firearms Act make it unlawful for any person to possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record. 26 U.S.C. § 5861(d). As used in the Act, the term "firearm" includes a "destructive device", and an explosive grenade is a destructive device. 26 U.S.C. §§ 5845(a)(8) and 5845(f).

trance, plaintiff did not respond to several knocks at the door. A battering ram was then used to open the door, and upon entry, the agents and police officers were confronted by plaintiff pointing a revolver in their direction. Gunfire ensued, and plaintiff was shot in the head and seriously wounded. In this suit, he claims that his injuries were proximately caused by a series of acts of negligence of agents of the federal government. Pursuant to applicable statutes, the case was tried by the Court sitting without a jury. 28 U.S.C. §§ 1346(b), 2402, 2674.

Besides denying that its agents were negligent and alleging contributory negligence on the part of the plaintiff, the government asserts a number of other defenses, as follows: (1) that if plaintiff were shot by a federal agent, his claim would be barred by 28 U.S.C. § 2680(h) which makes the Federal Tort Claims Act inapplicable to a claim arising out of an assault and battery; (2) that if plaintiff were shot by a county police officer, then any negligence of agents of the federal government was not the proximate cause of his injuries; (3) that plaintiff's suit is barred by the discretionary function exception contained in 28 U.S.C. § 2680(a) of the Act; and (4) that plaintiff may not recover in this action because the government agents acted in good faith and with a reasonable belief in the validity of the search and the way it was conducted.

■ Under the facts of this case, the first two defenses asserted by the government place plaintiff on the horns of a dilemma. Plaintiff did not sue the federal agents here involved individually, asserting a federal cause of action under the Fourth Amendment of the type recognized by Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Nor did plaintiff sue the county police officers involved under 42 U.S.C. § 1983, asserting a violation of his Fourth Amendment rights by persons acting under color of state law. See Street v. Surdyka, 492 F.2d 368 (4th Cir. 1974); Hill v. Rowland, 474 F.2d 1374 (4th Cir. 1973). Rather plaintiff chose to invoke the Federal Tort Claims Act and sue the United States, alleging that the negligence of government agents proximately caused his injuries. But if an agent of the United States fired the shot which wounded plaintiff, he is barred from bringing suit by § 2680(h) of the Act.[3] Alaniz v. United States, 257 F.2d 108 (10th Cir. 1958); United States v. Faneca, 332 F.2d 872 (5th Cir. 1964), cert. den, 380 U.S. 971, 85 S.Ct. 1327, 14 L. Ed.2d 268 (1965); Nichols v. United States, 236 F.Supp. 260 (N.D.Miss. 1964); Smith v. United States, 330 F. Supp. 867 (E.D.Mich.1971). And if a county police officer fired the critical shot, the question presented is whether plaintiff can prove that the negligence of agents of the federal government was the proximate cause of his injuries or whether the intentional act of a third person was not a superseding legal cause. See Restatement Torts, 2d §§ 448 and 449.

Plaintiff argues that the evidence here shows that the critical shot was fired by a county police officer and relies on those cases which have held that the assault exception to the Federal Tort Claims Act applies only to assaults by agents of the federal government and not to assaults by third parties which the government fails to prevent. Muniz v. United States, 305 F.2d 285, 287 (2d Cir. 1962), aff'd 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); Panella v. United States, 216 F.2d 622 (2d Cir. 1954); see Gibson v. United States, 457 F.2d 1391 (3rd Cir. 1972); Rogers v. United States, 397 F.2d 12, 15 (4th Cir. 1968). Quite clearly, the facts of those cases are quite different from what occurred here. But it is not necessary in this case to determine whether plaintiff

---

3. Under 28 U.S.C. § 2680, the provisions of the Federal Tort Claims Act do not apply to

"(h) Any claim arising out of assault, battery, * * * ".

has been able to avoid the twin pitfalls of the assault exception and the existence of a superseding legal cause. There are more compelling reasons why plaintiff cannot recover in this case. On the record here, this Court concludes both that agents of the United States were not negligent in acting as they did before the shooting, and that plaintiff's injuries were caused by his own contributory negligence. A full recounting of the facts is necessary.[4]

### The Facts

Shortly after the middle of May, in 1971, Special Agent Marcus J. Davis of the ATFD received information from Detective W. F. Seminuk, of the Prince George's County Police Department, indicating that a quantity of hand grenades had been observed by a confidential reliable source in Apartment No. 2 at 1014 Quebec Terrace, Silver Spring, Maryland. Davis had worked with Seminuk before, and the county police officer had previously supplied him with verified information which Davis had used in his work as a federal law enforcement officer.

Several weeks later, Agent Davis decided to seek a search warrant for the apartment in question. On Friday, June 4, 1971, Davis telephoned Assistant United States Attorney Charles G. Bernstein and relayed to him the information received from Seminuk. Seminuk had been told by a confidential reliable source that he had seen a quantity of hand grenades and also handguns in Apartment No. 2 at 1014 Quebec Terrace. The source also told Seminuk that the reported owner of these firearms was a white male known as Ken, that Ken owned a white Jeep with Maryland license plate HJ–5337 and that Ken had been observed in the recent past playing with several hand grenades in the rear of 1014 Quebec Terrace.

After being apprised of the information which Davis had received from Seminuk, Bernstein told Davis that he did not think it was sufficient for a search warrant and suggested that he develop more information before seeking the warrant. On Saturday, June 5, 1971, Davis spoke to Police Officer Louis Ciamillo of the Montgomery County Police Department, who told him that he had received information from a source residing in the vicinity of 1014 Quebec Terrace that the police would receive a false criminal report in the vicinity of that apartment building and that police would be shot when they responded to this call. On Sunday, June 6, 1971, Davis spoke to Police Officer Royce R. Hibbs of the Montgomery County Police Department, who told him that other officers had that very day interviewed an individual who advised them that they had observed a quantity of firearms in Apartment No. 2 at 1014 Quebec Terrace and that the owner of those firearms was a white male who owned a white Jeep. Officer Hibbs also told Davis that on an average of once a week, his police department received reports of firearms being discharged in the vicinity of the apartment building in question, but when the police went to the area to investigate all firearms and suspects had disappeared.

On Monday, June 7, 1971, Davis had another agent of ATFD check with the Maryland Department of Motor Vehicles, and it was ascertained that the owner of the vehicle with Maryland license plate HJ–5337 was Kenyon Franklin Ballew, 1014 Quebec Terrace, Apartment No. 2, Silver Spring, Maryland. Davis next telephoned Detective Seminuk and verified the information he had received from Seminuk several weeks before. Davis had also ascertained that Kenyon Franklin Ballew had been arrested on November 20, 1970 for carrying a concealed weapon and that the National Firearms Registration and Transfer Record revealed no firearms registered in the name of Kenyon Franklin Ballew.

---

4. Findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P., are embodied in this opinion, whether or not expressly so characterized.

Thereupon, Davis called Assistant United States Attorney Bernstein and told Bernstein of the additional information he had secured in the past several days.[5] Bernstein advised Davis that in his opinion Davis had sufficient probable cause for the issuance of a search warrant, and he told Davis to go ahead and apply for the warrant. Davis did so, preparing the necessary papers, including an affidavit, and presenting them to United States Magistrate F. Archie Meatyard, Jr. After reviewing the papers, Magistrate Meatyard signed the search warrant on the afternoon of June 7, 1971, authorizing a search of Apartment No. 2, 1014 Quebec Terrace, Silver Spring, Montgomery County, Maryland, for hand grenades not registered as required by law. The affidavit executed by Davis in support of his application for the warrant provided as follows:

> Your affiant stated that on June 7, 1971, he received information from Det. W. F. Seminuk, Prince Georges County Police Department, Hyattsville General Assignment Section, Hyattsville, Maryland to the effect as follows: that a confidential reliable source (the source's reliability is based on three separate reports of burglaries in the Langley Park area of Montgomery and Prince Georges Counties, Maryland which, according to police reports, in fact, took place or were attempted) told that detective that on May 5 or 6, 1971, the source observed a quantity of hand grenades in Apartment # 2, 1014 Quebec Terrace, Silver Spring, Maryland. The source stated it also observed a quantity of hand guns in that apartment. The source stated that the reported owner of these firearms is a white male known as "Ken", who operates a white jeep. The source stated that it also observed "Ken" playing with several hand grenades in the rear of 1014 Quebec Terrace, Silver Spring, Maryland, in the recent past. Det. Seminuk stated that the white jeep, reported by the source as "Ken's", has 1971 MD. license HJ–5337 affixed thereto. Department of Motor Vehicles for the state of Maryland reveal that this license plate is registered to Kenyon Franklin Ballew, 1014 Quebec Terrace, Apartment # 2, Silver Spring, Maryland.

> Your affiant stated that in June 6, 1971, he received information from Pvt. Royce R. Hibbs, Montgomery County Police Department, Silver Spring, Maryland, as follows: On that date, Det. Sgt. Roger Milstead, MCPD, and Det. Sgt. Wreford Norris, MCPD, interviewed a source at Silver Spring Detective Bureau, MCPD, Silver Spring, Maryland. The source stated that it had observed in the recent past, a quantity of firearms, mainly a carbine, a .44 caliber pistol, a .45 caliber pistol, and other firearms, in Apartment # 2, 1014 Quebec Terrace, Silver Spring, Maryland. The source identified the owner of those firearms as a white male who owns a white jeep.

> Private Hibbs also advised your affiant that on an average of once a week, his police department has received reports of firearms being discharged from the vicinity of 1014 Quebec Terrace, Silver Spring, Maryland. Upon arrival in the area, in response to these reports, all firearms and suspects had disappeared.

> Your affiant stated that on June 5, 1971, he received information from Private Louis Camillo, MCPD, Silver Spring, Maryland, as follows: That on 1/1/71, in the presence of Cpl. James Mahoney, MCPD, a source, who resides in the vicinity of 1014 Quebec Terrace, Silver Spring, Maryland,

5. Bernstein did not remember two telephone calls to him made by Davis on June 7. However, Bernstein's recollection of these events was understandably poor. This Court accepts Davis' testimony that he called Bernstein once during the morning of June 7, 1971 before applying for the search warrant and again in the afternoon after the warrant had been issued.

stated that one day the police would receive a false criminal report in the vicinity of 1014 Quebec Terrace, Silver Spring, Maryland. When the police responded to this call, they would be shot. Private Camillo stated, to his knowledge, several other threats of this nature have been received by this police department.

Maryland State Police Department records reveal that Kenyon Franklin Ballew was arrested on November 20, 1970, for carrying a concealed weapon (Case No. # 24587).

Your affiant states that a check with the National Firearms Registration and Transfer Record, Alcohol, Tobacco and Firearms Division, Washington, D. C., by Special Investigator William H. Seals, June 7, 1971, reveals no firearms are registered to Kenyon Franklin Ballew.

Agent Davis then called Assistant United States Attorney Bernstein again, advising him that the search warrant had been issued. Bernstein told Davis to keep him advised, whereupon Davis undertook to brief and assemble a team of federal agents of ATFD and of county police officers to conduct the search as soon as possible.[6] Some 12–14 law enforcement officers were assembled, consisting of 8–10 county policemen and 4 federal agents. In fact, there were two search warrants to be served at the same time at 1014 Quebec Terrace, one for Apartment No. 2, occupied by the plaintiff, and the other at Apartment No. 102, occupied by an individual named James Russell Thomas. Half the team was assigned to the Thomas apartment and the other half to the Ballew apartment. The apartment building at 1014 Quebec Terrace was located in a high crime area, which was described by one witness as a "haven for known criminals."[7] The agents and police officers had been warned to take special precautions in serving the warrant, in view of the reports of firearms in Apartment No. 2 and the threat received that a police officer responding to a call might be shot without warning.

Shortly before 8:30 P.M. on June 7, 1971, the law enforcement officers entered the building through a laundry room and then proceeded by way of a flight of stairs to an interior hallway and a door which led from the hallway into the living room of Apartment No. 2.[8] At the time, the apartment was occupied by both plaintiff and the woman he was then living with, Mrs. Saraluise McNeil.[9] Special Agent William H. Seals of the ATFD approached the door first and knocked in a normal manner. When there was no response, Agent Seals pounded on the metal door with his fist and shouted in a loud voice, "Federal officers with a search warrant, open up."[10] Again there was no response. Agent Seals then put his ear to the door and heard sounds as if someone were moving away from the door. At this point, having concluded that the occupants of the apartment did not intend to comply with his order to open up, Agent Davis ordered the use of a battering ram which the officers had brought with them. Several blows with the ram were necessary before the door finally came open some 12 to 18 inches. Agent Seals entered first, noticing immediately that some effort had been made to bar-

---

6. The federal agents were briefed at the ATFD office at Falls Church, Virginia. Subsequently, another briefing was held with all the participating law enforcement officers in attendance at the Silver Spring District Police Station.

7. Mrs. Ballew herself described the area as a "rough neighborhood."

8. Plaintiff argues that the officers did not enter through the "front" door. Whether or not the door entered could be called the front door, the evidence discloses that it was one of the principal means of gaining entrance into plaintiff's apartment.

9. Some seven months after this incident, Mrs. McNeil married plaintiff. Thus, when she testified at the trial, she was plaintiff's wife.

10. One police officer, stationed outside the building, testified that he could hear the pounding and the command from where he was then located.

ricade the door.[11] As Agent Seals moved into the room, he suddenly looked up and saw the plaintiff standing nude in an area beyond the living room with a long-barreled revolver pointed in the Agent's direction. Shouting, "He's got a gun," Agent Seals drew his own pistol from his holster, fired a shot and moved to the left to take cover.[12]

Montgomery County Police Officer Royce R. Hibbs was the next member of the team to enter the room. He likewise observed plaintiff pointing a handgun in his direction. Hibbs ducked to the right, firing several shorts as he sought to move to a place of safety.

Next into the room was Officer Louis Ciamillo of the Montgomery County Police. When he saw plaintiff pointing a revolver in his direction, he took careful aim with his pistol and fired. From the evidence, this Court finds that Officer Ciamillo fired the shot which struck plaintiff in the head. Plaintiff fell to the floor bleeding profusely, firing his own weapon as he fell. It cannot be determined on the record here whether plaintiff attempted to fire his weapon at the police officers before he himself was struck. What is clear is that his revolver did not discharge until he was actually falling and that the projectile from his revolver was discharged in a downward direction.

Also in the apartment at the time was Mrs. McNeil, who had likewise armed herself with a loaded pistol before the shooting occurred. Clad only in her underwear, she surrendered to the officers when ordered to do so, becoming hysterical and shouting, "Help, murder, police," when she saw plaintiff lying wounded on the floor. An ambulance was called, and plaintiff was removed to the hospital.

The agents and officers then undertook a search of the premises, recovering a large quantity of firearms, powder, ammunition, primers, fuses and other firearm parts, including the following grenade-type items: [13]

(1) 1 practice rifle grenade, marked "inert";

(2) 1 smoke or gas grenade canister, with no fuse assembly;

(3) 1 smoke or gas grenade canister, with fuse assembly;

(4) 1 practice hand grenade, with fuse assembly;

(5) 1 plastic grenade, baseball type, with fuse assembly.

### The Issue of Negligence

From the facts set forth hereinabove, this Court concludes that agents of the federal government were not negligent in securing a search warrant for plaintiff's apartment and in undertaking to conduct a search of such premises after the warrant was issued. In preparing and presenting the affidavit submitted to Magistrate Meatyard, Agent Davis acted reasonably and in the exercise of due care. In thereafter planning the search and in actually carrying it out, Agent Davis and the other federal agents acted as reasonably prudent persons would under all the circumstances. When Agent Seals fired his pistol at plaintiff inside the apartment, he was acting reasonably under the emergency conditions then existing in order to avoid injury to himself.[14] Acts performed under the stress of an emergency are to be judged for negligence with a different measure from that used in weighing acts performed under normal conditions. United States v. Jasper, 222 F.2d 632, 633 (4th Cir. 1955).

---

11. Pillows had been stacked against the door and a chair had been placed so as to block access to Ballew's living room.

12. The evidence indicates that Seals did not enter the room with his gun in his hand. Seals drew his pistol only after he saw the plaintiff aiming at him with a revolver.

13. Items (2) through (5) were included in the original return filed with Magistrate

Meatyard on June 14, 1971. Item (1) was included in the supplementary return of July 1, 1971.

14. Of course, the federal agent's shot did not strike plaintiff. Even assuming that the shot fired by Agent Seals caused County Officer Ciamillo to shoot plaintiff, the federal agent was not negligent in opening fire first under the circumstances here.

When he first entered plaintiff's living room, Agent Seals became immediately aware of the attempted barricade of the door, and it was reasonable for him to assume that the occupants of the apartment were actively resisting the entry of the law enforcement officers. When he was then confronted with the plaintiff pointing a revolver at him, he was justified in shooting first before the plaintiff fired at him. In a Federal Tort Claims suit such as this one in which acts of a government agent are being challenged, the court "must not too strictly limit what a federal officer should do in carrying out a dangerous duty imposed on him * * * by virtue of his office." United States v. Folk, 199 F.2d 889, 892 (4th Cir. 1952).

Plaintiff argues that Agent Davis should have undertaken a more extensive and careful investigation before seeking a search warrant from the Magistrate. The simple answer to this contention is that Davis' belief stated in the affidavit that there were unregistered hand grenades in Ballew's apartment proved to be entirely accurate. This Court finds that several of the grenades seized by the federal agents on June 7, 1971 in Ballew's apartment, 'in combination with components likewise seized, were firearms as defined in the National Firearms Act and had not been registered as required by law.

Plaintiff contends that the items seized were harmless when found, were neither designed nor intended to be used as firearms and therefore were not in violation of federal law. The evidence in this case does not support such contention.

26 U.S.C. § 5861(d) makes it unlawful for any person "to * * * possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record; * * *." § 5845(a)(8) defines firearm as "a destructive device." The term "destructive device" is further defined as follows in § 5845(f):

*(f) Destructive device.*—The term "destructive device" means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary or his delegate finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordinance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10 of the United States Code; or any other device which the Secretary of the Treasury or his delegate finds is not likely to be used as a weapon, or is an antique or is a rifle which the owner intends to use solely for sporting purposes.

In United States v. Freed, 401 U.S. 601, 609, 91 S.Ct. 1112, 1118, 28 L.Ed.2d 356 (1971), Mr. Justice Douglas observed that the National Firearms Act "is a regulatory measure in the interest of public safety, which may well be premised on the theory that one would hardly be surprised to learn that possession of hand grenades is not an innocent act." More recently, the United States Court of Appeals for the Fourth Circuit

has had occasion to construe § 5845(f) in United States v. Morningstar, 456 F. 2d 278 (4th Cir. 1972). At page 280 of that opinion, the Court said the following:

> Section 5845(f), subparagraph (1) deals with explosive and incendiary devices which have no business or industrial utility. They are covered regardless of their intended use. Subparagraph (2) is inapplicable because it refers to weapons. Subparagraph (3) deals with two types of materials "from which a destructive device may be readily assembled." The first type is a "combination of parts . . . *designed* . . . for use in converting any device into a destructive device. . . ." [Emphasis added] such as a bomb. This type includes, for example, the unassembled parts of a military fragmentation or incendiary bomb. Because of their design they are proscribed regardless of how the possessor intends to use them. If Congress had resolved not to include commercial explosives, it could have stopped at this point. Instead, in subparagraph (3) it defined a second type of illegal materials as a "combination of parts . . . *intended* for use in converting any device into a destructive device. . . ." [Emphasis added] such as a bomb. It is apparent, therefore, that Congress provided that the use for which these materials are intended determines whether they fall within the Act. (Emphasis in original.)

At page 281, the Court went on to say:

> On its face, the definition of a destructive device gives fair notice to a person of ordinary intelligence that it includes any combination of parts intended to be used as a bomb or weapon and from which a bomb or weapon can be readily assembled. *See* United

States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954).

■■■ Included among the many items seized in plaintiff's apartment on June 7, 1971 were a practice fragmentation hand grenade, a plastic, baseball type grenade, and a smoke or gas grenade canister. (Defendant's Exhibits Nos. 6, 7 and 8). Each of these items was equipped with a grenade fuse assembly. Also recovered in proximity to the grenades were several cans of black powder and a number of cans of smokeless powder suitable for use in rifles, pistols and shotguns. (Defendant's Exhibits Nos. 10–15, inclusive). From the testimony of the witness Scroggie (called as an expert by the government) and from an examination of the exhibits themselves, including photographs of various tests conducted by the government, this Court finds that these three grenades together with the powder seized were in combination both designed and intended to be used as destructive devices. Although these grenades could not have been exploded as found, they could have been fully activated merely by adding either the black powder or the smokeless powder likewise seized in plaintiff's apartment on June 7, 1971.[15] Unassembled parts of a hand grenade, like parts of a military fragmentation bomb, would be a combination of parts "designed" for use in converting any device into a destructive device within the meaning of § 5845(f)(3). *See* United States v. Morningstar, *supra*, 456 F.2d at 280. In United States v. Shafer, 445 F.2d 579 (7th Cir. 1971), cert. den. 404 U.S. 986, 92 S.Ct. 448, 30 L.Ed.2d 370 (1971), the Court held that grenade shells, fuses and powder in combination constituted a "destructive device" under § 5845(f), even though unassembled. In United States v. Kiliyan, 456 F.2d 555 (8th Cir. 1972), a training grenade, similar to Defend-

---

15. In addition, the practice hand grenade would have required a plug in the bottom to retain the charge. Any ordinary material such as wood, wax, lead or paper would have been sufficient for this purpose.

ant's Exhibit No. 6 in this case, was held to be in violation of this statute.

Plaintiff relies on that part of § 5845(f) which provides that "the term 'destructive device' shall not include any device which is neither designed nor redesigned for use as a weapon, *. * *." It is argued that possession of ordinary household articles would result in a violation of the law if the government's interpretation of the statute is accepted here. Such argument was specifically rejected in United States v. Davis, 313 F.Supp. 710, 714 (D.Conn. 1970), in which the Court found that cloth, gasoline and bottles which could be used to construct a Molotov cocktail were a combination of parts in violation of § 5845(f). The Court concluded that what Congress meant by the term "combination" was "an association of the components of a destructive device, at the same time and place, capable of being converted into a destructive device—not an actual union of parts in an assembled device." *See* also United States v. Ross, 458 F.2d 1144, 1145 (5th Cir. 1972).

 Moreover, the grenade shells themselves in this case had been "redesigned" for use as a weapon. Thus, the component parts seized here would also fall within the second type of illegal materials proscribed by § 5845(f)(3), as the evidence shows that in combination they were "intended" to be converted into destructive devices such as active hand grenades.[16] Plaintiff was a collector of firearms and ammunition of various types and was in possession of a large quantity of weapons, devices and component parts at the time of the raid on June 7, 1971. Plaintiff spent much of his spare time disassembling, cleaning and re-assembling his weapons and firing them at practice ranges. He had inserted pistol primers in the fuse assemblies of the smoke grenade (Defendant's Exhibit No. 8) and the practice hand grenade (Defendant's Exhibit No. 6), had placed paper caps in the fuse assembly of the plastic grenade (Defendant's Exhibit No. 7) and had done other work on these devices designed to reactivate them. By placing live pistol primers in two of these grenades, plaintiff clearly disclosed his intention to make them explosive. Plaintiff argues that the smoke grenade contained no delay element and therefore could not in fact be used as a true hand grenade. Although as reactivated the smoke grenade could not be thrown without causing injury to the thrower, it was quite capable of being used with other items in the apartment as a booby trap and as such constituted a destructive device within the meaning of § 5845(f) (3).

 Plaintiff next argues that the affidavit of Agent Davis, submitted in support of the application for the search warrant, does not meet the standards laid down by the Supreme Court in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). In particular, it is claimed that the information used was stale, that Davis should not have included in his affidavit hearsay information received by Detective Seminuk and relayed to Agent Davis, and that some of the information in the affidavit was erroneous.[17] There is no merit to any of these contentions. The information included in the affidavit indicating that plaintiff had illegal hand grenades in his apartment later proved to be completely accurate, as the original and supplementary returns disclosed. When information comes to an affiant through official channels, as here, it is not necessary that the affiant must personally know that the source was reliable. Travis v. United States, 362 F.2d 477, 481 (9th Cir. 1966); United States v. Shipstead, 433 F.2d 368, 372 (9th Cir. 1970); *see* United States v. Ventresca, 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). Finally, the accuracy of the af-

16. The law requires merely that the component parts be "designed *or* intended" to be converted into a destructive device. Here, both parts of the test have been satisfied.

17. The evidence indicated that plaintiff owned a Ford Bronco rather than a Jeep.

fidavit is not significantly affected because the motor vehicle owned by plaintiff was described therein as a white Jeep when in fact plaintiff owned a white Ford Bronco. There was no material misrepresentation of the facts here. The evidence indicates that a Ford Bronco looks like and could readily be described as a Jeep. The significance of information in the affidavit relating to the so-called "Jeep" is that records of the Maryland Department of Motor Vehicles confirmed the accuracy of the confidential informant's report that a man named Ken owned a motor vehicle with Maryland license HJ–5337 and lived in Apartment No. 2, 1014 Quebec Terrace. This Court concludes that the affidavit of Agent Davis under attack here satisfies the requirements of Aguilar v. Texas, *supra*, and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

■ Plaintiff claims that Davis was negligent in assembling a team as large as 12 to 14 men to carry out the raid. But the evidence shows that plaintiff lived in a high crime area and that two search warrants were to be served in the building at the same time. Two county police officers were left outside to guard the police cruisers, leaving 5 or 6 federal agents and county officers to serve the warrants at each apartment. Agent Davis was not negligent in assembling a team of this size.

Finally, plaintiff argues that Agent Davis did not wait long enough at the door of plaintiff's apartment before ordering the use of the battering ram. But the evidence discloses that fair and adequate warning had been given to the occupants of plaintiff's apartment before efforts were undertaken to open the door forcibly. After twice knocking on the door and announcing the presence of federal agents in a loud voice and after hearing sounds from within indicating that someone was moving away from the door, Agent Davis acted reasonably in ordering the use of the battering ram. Five or six blows by the ram were necessary before the door was forced open. At any time while the ram was being used, plaintiff could have avoided damage to his door (and presumably the later personal injuries he sustained) by opening the door and admitting the officers who were then lawfully engaged in serving this federal warrant.

## The Issue of Contributory Negligence

■ Even had he been able to produce at trial proof of negligence on the part of agents of the government, plaintiff would still not be entitled to recover damages in this case. The evidence here indicates that plaintiff's injuries were the direct result of his own contributory negligence.

From the evidence here, this Court finds that plaintiff heard the law enforcement officers at his door.[18] Rather than admitting the officers and submitting to a search of his premises, plaintiff chose to resist the lawful right of the agents to enter his apartment. Attempts were made to barricade the door and prevent entry by the officers. Even more imprudently, plaintiff and Mrs. McNeil armed themselves and prepared to shoot it out with the officers. After Agent Seals had entered the apartment and fired the first shot, plaintiff continued to point his loaded revolver at the other agents and officers who followed Seals into the room. Even after the first shot, plaintiff could have avoided injury to himself by taking cover and surrendering his weapon, or at the very least by not pointing his revolver at the other officers who entered the room after Agent Seals. His own negligent actions led directly to the serious injuries he suffered.

The credible evidence in this case does not support plaintiff's contention that he did not know that these men in his apartment were law enforcement officers.

---

18. Because of his injuries, plaintiff was unable to testify at the trial. Other testimony and evidence in the case lead to this finding that he knew of the presence of these federal agents and of their purpose.

This Court finds that plaintiff did in fact hear the knocking and the loud announcement that federal officers were at the door with a search warrant. Although dressed in civilian clothes, a badge was prominently displayed by Agent Seals who was the first law enforcement officer to enter the apartment.

Whatever plaintiff was doing in the nude before the officers entered his apartment, he was not, as he claims, in the bathtub when they first knocked on his door. The evidence discloses, in the words of one witness, that he was "bone dry" when shot. More likely, plaintiff was not dressed when he first heard law enforcement officers at his door and in his haste to arm himself and try to keep them out, he did not take the time to clothe himself.

### Conclusion

For the reasons stated, the plaintiff is not entitled to·recover damages for the injuries he has sustained. Judgment is therefore entered in favor of the defendant, with costs.