**UNITED STATES of America, Appellee,**

v.

**James A. HARVEY, a/k/a Ray Stewart, a/k/a Joseph R. Stewart, Appellant.**

**No. 75–1846.**

United States Court of Appeals, Eighth Circuit.

Submitted April 14, 1976.

Decided Aug. 24, 1976.

R. David Lewis, Little Rock, Ark., for appellant.

Samuel A. Perroni, Asst. U. S. Atty., Little Rock, Ark., for appellee; W. H. Dillahunty, U. S. Atty., Little Rock, Ark., on brief.

Before VAN OOSTERHOUT, Senior Circuit Judge, and LAY and WEBSTER, Circuit Judges.

WEBSTER, Circuit Judge.

James Allen Harvey appeals from his conviction by jury of violation of the Wire Fraud Act, 18 U.S.C. § 1343, by use of a device sometimes known as a "blue box". Such a device circumvents the billing system of telephonic communication carriers and allows a caller to place long distance calls without charge. To utilize a "blue box" device, a caller first completes a long distance call to a toll free telephone number. The device is then operated to emit a 2600 cycle tone which disconnects the completed call and clears the line. The caller may then place a call to any telephone number without being detected by the billing system by operating the "blue box" to emit multifrequency tones of the type otherwise used by the communication carrier.

On appeal, Harvey contends (1) that evidence seized in his home should have been suppressed as the fruits of an illegal wire interception; (2) that certain of the evidence seized should have been suppressed as not properly described in the search warrant; (3) that the District Court erred in reading the indictment as a part of the instructions; and (4) that the District Court erred in denying the post-trial motions based on newly discovered evidence of perjury by a government witness and suppression of evidence by government counsel. We affirm the judgment of conviction.

The principal focus of the appeal is upon the detection procedures employed by telephone company employees and the subsequent investigative efforts of the Federal Bureau of Investigation, an understanding of which requires a more detailed recitation of the facts.

On July 11, 1974, James Handloser, the Security Manager for Southwestern Bell Telephone Company in Little Rock, Arkansas, determined from a computer analysis of lengthy long distance telephone calls to toll free numbers that a "blue box" device might be operating from the telephone number of James Harvey. A Hekimian Dial Number Recorder, which is a paper-tape recording device, was attached to Harvey's telephone line on August 1, 1974, in order to detect any "blue box" activity emitting from his transceiver. The Hekimian tape printed information on all outgoing calls, including the time the transceiver was lifted off the hook and the number dialed, as well as indicating the emission of a 2600 cycle tone and the numbers represented by the multi-frequency tones used to make a second long distance call.

On August 2, 1974, the Hekimian device detected 2600 cycle tones but failed to print properly the numbers called immediately after the emission of the tones. The failure of the Hekimian device to print the numbers was apparently the result of the poor quality of the multifrequency tones emitted by the "blue box". Handloser then determined that a voice tape recorder should also be attached to Harvey's line, and this was accomplished on August 5. The tape recorder was attached to the line on an "off-hook" basis, so that recording was automatically activated at the instant the transceiver was lifted from its cradle, thus capturing the multifrequency dialing tones, which revealed the number called as well as the opening salutations between the parties to the call. The tape recorder was usually programmed to record the contents of the first two minutes of each incoming and outgoing call, although at times the use of a one minute recording time was attempted.

On each weekday during the entire period of the wire interception, Southwestern Bell Security Representative Robert Hubble inspected the Hekimian paper tape. If the paper tape did not indicate the emission of a 2600 cycle tone on Harvey's line, it would be immediately destroyed. The voice recordings for the day would then be erased by Hubble without anyone listening to their contents. If the paper tape indicated the emission of a 2600 cycle tone, Hubble would retain the paper tape, and only the voice recording of the call following the 2600 cycle tone would be audited by Hubble in an attempt to identify the parties involved in the conversation. The remaining portions of the voice recording would be erased.

On August 18, the Hekimian device again noted the emission of a 2600 cycle tone but failed to designate the number dialed immediately thereafter. Examination of the voice recording of this call by Hubble revealed that the caller was addressed in the salutation as "Roland". In the conversation, a male voice identified by the caller only as "Dad" indicated an interest in tennis. Hubble checked the current newspapers and discovered a father-son tennis tournament was to be played on August 19 at the Little Rock Country Club. From an inquiry with the Arkansas Tennis Patrons Association, Hubble learned that a Rollin Caristianos and his father were to play in the tournament. Rollin Caristianos had given the tennis association an address and telephone number identical to those of the residence of James Harvey.[1]

Surveillance continued on the Harvey line, and "blue box" calls were again recorded by the Hekimian device on August 25, September 4, and September 16. On August 25, during a weekend, the voice recorder ran out of tape and thus failed to produce a recording. On September 4, a one-minute voice recording disclosed only the name "Roland" as that of the caller. On September 16, however, the voice recording produced significant results. The caller, though not identified by name, was clearly not "Roland". The called party was identified when the recipient stated "Good afternoon, Memorex" and the caller asked for an extension belonging to a person named "Elaine". Handloser listened to this tape and thereafter called several Memorex listings to determine whether one had an identical extension number belonging to a person named Elaine. The recipient of the call was in this way identified as Elaine Vetter, who worked at a Memorex office in Los Angeles, California.[2] On the following

1. Rollin Caristianos testified for the government at trial, stating that he had lived in an apartment at the Harvey residence from June to September, 1974. He testified that he had viewed a strange telephone at the premises and that Harvey had informed him that a tape could be made so that he could make free telephone calls; that Harvey made the tape and operated it into the telephone on several occasions so that he could make calls to his family;

and that Harvey stated that a tape had been made to allow free calls to California.

2. Vetter subsequently testified as a government witness, stating that she was employed by the Memorex Corporation in Los Angeles, California, and had received long distance calls from Harvey at the Memorex number. She identified the caller on the voice recording of September 16, 1974, to "Elaine" at Memorex as James Harvey.

day, September 17, 1974, Handloser contacted the Federal Bureau of Investigation for the first time in regard to the investigation of Harvey. On September 18, another "blue box" call was recorded and the caller was again identified in the salutation as "Roland".

Handloser terminated the monitoring of Harvey's telephone by the Hekimian device and voice recorder on September 19 after being informed by the FBI that a search warrant would be executed. That day, FBI Special Agent Robert Matthews obtained a warrant for the search of Harvey's residence which described the subject of the search as a "blue box", stating that it was "an electronic device that allows a caller to make long distance phone calls without them being recorded for billing by the telephone company". The affidavit for the search warrant by Agent Matthews stated in part that "[a] blue box has approximately 13 buttons or switches which emit tones that cause the telephone switching network to react as it would to dialed long distance calls".

Agent Matthews and three other special agents, including Edward Holt, who had received special training in electronics, executed the search warrant in the presence of Harvey at approximately 5:00 p. m. the same day. Four telephones, two of them unconnected, were found in the residence. The agents discovered and seized a plastic device with a phone jack on one side and a toggle switch on the other, which they believed to be a "black box".[3] The search did not, however, disclose a mechanical device of the physical composition described in Agent Matthew's affidavit. Agents Matthews and Holt were aware that a tape recording could effectively replicate the 2600 cycle and multifrequency tones emitted by a "blue box". Holt discovered a

substantial number of cassette tapes in Harvey's office and, ignoring those which were plainly commercial or blank tapes, proceeded to play tapes on one of the many tape machines present on the premises. After approximately a dozen of the tapes were played, three were seized, two of them as components of a "blue box" operation. One of these tapes contained an ordered series of the multifrequency tones used by Southwestern Bell equipment to complete long distance calls. The second was later analyzed by the FBI and found to contain a multifrequency tone sequence which, played after the emission of a 2600 cycle tone, would enable completion of a toll free call to a particular number.

Several pretrial motions were submitted by Harvey, generally seeking to suppress the use in evidence of (1) the cassette tapes and the "black box" device seized at his residence, as the subjects of an illegal search and seizure; and (2) these objects as well as the testimony of Caristianos and Vetter, as the fruits of an illegal wire interception by Southwestern Bell. These motions were denied by the District Court.[4] *United States v. Harvey*, 394 F.Supp. 228 (E.D.Ark.1975). Following conviction by a jury, Harvey filed motions for new trial, a rehearing on the motions to suppress, and a continuance of sentencing. These motions were also denied, and the District Court[5] proceeded to sentence Harvey to two years imprisonment with all but two weeks suspended.

## I.

18 U.S.C. § 2511(1) prohibits the willful interception and disclosure of wire or oral communication by communication carriers, unless such action is justifiable under 18 U.S.C. § 2511(2), subsection (a)(i) of which provides:

---

3. A "black box" allows the user to *receive* calls without any billing charge to the caller by emitting a signal which indicates to the billing system that no connection has been accomplished. *See* note 11, *infra*.

4. The Honorable J. Smith Henley, Chief Judge, United States District Court for the Eastern

District of Arkansas, now a member of this Court.

5. The Honorable G. Thomas Eisele, Chief Judge, United States District Court for the Eastern District of Arkansas, who presided at trial.

It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the carrier of such communication: *Provided,* That said communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

18 U.S.C. § 2515 prohibits the use in evidence of the contents of any intercepted communication and any material derived therefrom in a court of law if the disclosure of the information would violate 18 U.S.C. § 2511. *See also* 18 U.S.C. § 2517(3).

Harvey contends that the evidence of the three cassette tapes,[6] the "black box", and the testimony of Rollin Caristianos and Elaine Vetter should have been suppressed as the fruits of an illegal and unjustified wire interception because, within the meaning of 18 U.S.C. § 2511(2)(a)(i): (1) the interception was unreasonable in scope and duration and thus not "necessary"; (2) it was not made in the "normal course" of employment of the Southwestern Bell officials; and (3) it was not made incident to the rendition of service or the protection of rights or property of the carrier, but was incident only to the criminal prosecution.

### A.

■ Harvey first contends that the investigative activity of Southwestern Bell

was patently unreasonable in that it involved the interception of "countless innocent calls" for the six-week period during which the voice recorder was utilized.[7]

The Fifth Circuit has aptly delineated the minimum privilege accorded a telephone company under 18 U.S.C. § 2511(2)(a)(i):

[W]e * * * hold that § 2511(2)(a), at a minimum, authorizes a telephone company which has reasonable grounds to suspect that its billing procedures are being bypassed to monitor any phone from which it believes that illegal calls are being placed. If * * * it discovers the existence of illegal calls, § 2511(2)(a), again at a minimum, authorizes it to record, audibly, the salutations. Additionally, § 2511(2)(a) allows a telephone company to divulge, at least, the existence of the illegal calls and the fact that they were completed (the salutations) to law enforcement authorities and ultimately to the courts, since such disclosures are a necessary incident to the protection of the company's property rights. As authorized disclosures, such evidence is admissible in court. 18 U.S.C. § 2517(3).

*United States v. Clegg,* 509 F.2d 605, 612–13 (5th Cir. 1975) (footnote omitted). Such authority, however, may be exercised only to the extent necessary for "the protection of the rights or property of the carrier". Harvey argues that Southwestern Bell exceeded the permissible scope of a justified wire interception by an overindulgence in monitoring which was (1) excessive in scope and duration, and (2) continued after the carrier had obtained sufficient evidence for a wire fraud prosecution.

■ Section 2511(2)(a)(i) does not provide for a specific time limitation during which a

---

**6.** Only the two cassette tapes referred to in our factual summary were actually offered and admitted into evidence at trial.

**7.** Harvey does not and could not contend that the monitoring conducted in this case was random, because the automatic devices utilized by Southwestern Bell were not installed until after evidence of illegal calls from his number was obtained. Moreover, Harvey does not and could not contend that the use of the Hekimian

Dial Number Recorder effected an impermissible interception on his line because, as a telephone subscriber, he had no reasonable expectation that records of his calls would not be made. *See United States v. Clegg,* 509 F.2d 605, 610 (5th Cir. 1975); *United States v. Baxter,* 492 F.2d 150, 167 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974); *Brandon v. United States,* 382 F.2d 607, 610–11 (10th Cir. 1967).

justified wire interception may legally continue. The federal courts, however, have construed the statute to impose a standard of reasonableness upon the investigating communication carrier.[8] *See United States v. Clegg, supra*, 509 F.2d at 613–14; *United States v. Shah*, 371 F.Supp. 1170, 1172–76 (W.D.Pa.1974). *See also People v. Mahoney*, 47 Cal.App.3d 699, 710–16, 122 Cal.Rptr. 174, 181–85 (1975). Harvey relies primarily upon *Bubis v. United States*, 384 F.2d 643 (9th Cir. 1967), to argue that the interception was unreasonable in duration. In *Bubis*, the Ninth Circuit held:

> When a subscriber of a telephone system uses the system's facilities in a manner which reasonably justifies the telephone company's belief that he is violating his subscription rights, then he must be deemed to have consented to the company's monitoring of his calls to an extent reasonably necessary for the company's investigation. * * *

> The record discloses that the telephone company continued * * * for a period of three months, to monitor all calls made and received by appellant, and to tape record the conversations of all such calls. In our view the monitoring and tape recording for such length of time, after ample evidence had been secured of the illegal use by appellant of the compa-

ny's facilities, was unreasonable and unnecessary.

*Id.* at 648.

▮ The form of the investigation in the present case was of a different nature. The use of the voice recorder continued for a six-week period. Although all calls were monitored, the monitoring was not that of the entire contents of the calls; rather, merely the first one or two minutes of each call were recorded in an attempt to obtain a name from the salutations. Moreover, Robert Hubble erased every voice recording of conversations not preceded by a 2600 cycle tone without listening to their contents. Even the Hekimian paper tapes relating to non-"blue box" calls were destroyed. Only the tape segments following certain 2600 cycle tones—four calls in total—were heard, and these were listened to solely by Hubble or Handloser prior to the notification of the FBI. We think that the procedure utilized by the Southwestern Bell officials provided, within the limits of present technology, for minimal interception of the audible contents of telephone conversations on Harvey's line.

The reasonableness of the duration of the interception is seriously questioned only in conjunction with Harvey's contention that the monitoring should have terminated on August 18, 1974, the date on which "Ro-

---

**8.** Prior to 1968, 47 U.S.C. § 605 was intercepted by the federal courts to preclude the use in evidence of conversations illegally intercepted by communication carriers. Divulgence of conversations was allowed, however, where they had been intercepted as the result of a reasonable investigation by a communication carrier in attempting to protect its rights or property. *See Hanna v. United States*, 404 F.2d 405, 406–07 (5th Cir. 1968), *cert. denied*, 394 U.S. 1015, 89 S.Ct. 1625, 23 L.Ed.2d 42 (1969); *Bubis v. United States*, 384 F.2d 643, 648 (9th Cir. 1967); *Brandon v. United States*, 382 F.2d 607, 611 (10th Cir. 1967); *United States v. Beckley*, 259 F.Supp. 567, 571 (N.D. Ga.1965). In 1968, Chapter 119, including 18 U.S.C. § 2511, was added to Title 18 of the United States Code, and an amendment to 47 U.S.C. § 605 made it expressly subject to the

new chapter. As a result, it is apparent that the issue of whether or not evidence acquired by a communication carrier was permissibly intercepted and disclosed at a criminal trial is presently governed by 18 U.S.C. § 2511(2)(a)(i) and not 47 U.S.C. § 605. *United States v. Clegg*, 509 F.2d 605, 611 (5th Cir. 1975); *United States v. Freeman*, 373 F.Supp. 50, 52 (S.D.Ind. 1974); *United States v. Shah*, 371 F.Supp. 1170, 1172–76 (W.D.Pa.1974); *United States v. DeLeeuw*, 368 F.Supp. 426, 427–28 (E.D.Wis. 1974). Yet, as the legislative history of 18 U.S.C. § 2511(2)(a) indicates: "It is intended to reflect existing law (*United States v. Beckley*, 259 F.Supp. 567 (D.C.Ga.1965))." 2 U.S.Code Cong. & Admin.News 2182 (1968). Hence, the federal courts have applied a standard of reasonableness in assessing the admission of evidence predicated on 18 U.S.C. § 2511(2)(a)(i).

land" was tentatively identified by Robert Hubble as Rollin Caristianos. The District Court found that it was reasonable for the Southwestern Bell officials to be reluctant to seek prosecution at this time solely on the basis of information deduced from the newspapers and the tennis association, and this finding cannot be said to be clearly erroneous. The government properly notes, moreover, that 18 U.S.C. § 2511(2)(a)(i) does not limit the investigatory effort of a communication carrier to a single potential violator utilizing a certain telephone line. *Cf. United States v. Clegg, supra,* 509 F.2d at 614. On the day that "Roland" was tentatively identified, the voice recorder indicated that another person was involved in a "blue box" call from Harvey's number. In light of this development, Southwestern Bell had reasonable grounds to continue monitoring in order to protect itself from abuse by Harvey as the subscriber to the telephone.

■■ We therefore hold that the wire interception was not unreasonable in duration and was necessary to the protection of the rights and property of Southwestern Bell.[9]

### B.

Harvey contends that the wire interception undertaken by Southwestern Bell was not in the "normal course" of the business of its employees. This contention apparently ignores the testimony of Handloser, the Security Manager for Southwestern Bell in Little Rock, Arkansas, who directed the interception operation. Handloser testified that his official duties focused primarily on the investigation of thefts of Southwestern Bell services, and that detection of telephone fraud devices was thus an inherent part of his duties. He also stated that the Security Council of Southwestern Bell had granted him specific authority to intercept communications in the investigation of

"blue box" cases in order to determine the telephone numbers elicited and the salutations.

■ In light of this uncontradicted evidence, there is no serious basis for a contention that Handloser acted outside his normal course of employment in directing the interception procedure and disclosing the results of the investigation to relevant law enforcement authorities.

### C.

■ Harvey further contends that the monitoring activities of Southwestern Bell were solely directed at gathering evidence for possible criminal prosecution and therefore were not incident to the protection of the rights and property of the communication carrier. This argument disregards the clear purpose of 18 U.S.C. § 2511(2)(a)(i), which was designed to allow the disclosure of justified wire monitoring by communication carriers for the purpose of criminal prosecution of those who fraudulently use their services. Criminal prosecution not only precludes continued abuse by a particular wrongdoer but may also provide a deterrent effect on other potential wrongdoers. Wire interception to provide evidence for a wire fraud prosecution is certainly an activity undertaken for protection of the carrier's rights and property. *See United States v. Freeman,* 373 F.Supp. 50, 52 (S.D.Ind.1974); *United States v. De-Leeuw,* 368 F.Supp. 426, 428 (E.D.Wis.1974); *People v. Mahoney, supra,* 47 Cal.App.3d at 716, 122 Cal.Rptr. at 185.

■ We therefore hold that the District Court did not err in refusing to suppress evidence obtained through the electronic surveillance activities of Southwestern Bell, since such activities were within the exception to 18 U.S.C. § 2515 provided

---

**9.** We do not say that six weeks is per se a reasonable period of wire interception. Reasonableness must be assessed under the facts of each case, including the scope of the monitoring, the hard evidence accumulated at a given time, and the additional information thus

known by the communication carrier. To be admissible, evidence obtained through wire interception by telephone company officials must fall demonstrably within the narrow exception created by 18 U.S.C. § 2511(2)(a)(i). The government met that burden in this case.

by 18 U.S.C. § 2511(2)(a)(i).[10] *See also* 18 U.S.C. § 2517(3).

## II.

Harvey also questions the admission of the cassette tapes and the "black box" in evidence on the ground that their seizure at the Harvey residence exceeded the permissible scope of the search warrant. The warrant authorized a search of the Harvey residence solely for "a 'blue box', an electronic device that allows a caller to make long distance phone calls without them being recorded for billing by the telephone company". In the affidavit for the search warrant, Agent Matthews described a "blue box" as follows:

A blue box has approximately 13 buttons or switches which emit tones that cause the telephone switching network to react as it would to dialed long distance calls. A blue box can be permanently attached to a telephone line or placed against the receiver. A blue box user dials a toll free long distance number and thereby enters a long distance network. The caller then activates a master tone which drops the toll free number and still allows the caller to remain in this long distance network. The caller then activates a tone which indicates to the network that a number is going to be coming into it. The caller can then key the desired number and a start switch which sends this number into the network. The telephone company records show only the free toll call and not the subsequent call made by the blue box user. The parts required to build a blue box can be purchased at most electronic stores and a cheap unit could be built for as little as $30 to $35. Blue box is the commonly used term for this device, although it is not necessarily blue in color.

Agent Edward Holt was one of three agents who assisted Agent Matthews in the search of the Harvey residence. Holt testified at the suppression hearing that he had received special training in electronics and was in fact a radio technician for the FBI. As a result, he was aware that the functions of a "blue box" could be performed by tape recordings of relevant tones. During the course of the search, in which no device resembling the usual "blue box" could be found, the agents discovered a number of cassette tapes in Harvey's office. Holt proceeded to play approximately twelve of these tapes on a nearby instrument, and found that two of the tapes constituted functional portions of a "blue box" operation.

Harvey argues that the seizure of these tapes was beyond the scope of the warrant, apparently contending that the warrant was limited by the description of the "blue box" contained in the affidavit, which referred to a mechanical device with numerous switches or buttons, which clearly is not the physical description of cassette tapes.

The Fourth Amendment does not prescribe the form or content required of a

---

**10.** Harvey additionally contends that 18 U.S.C. § 2511(2)(a)(i), by extending wire interception power to communication carriers in certain instances, authorizes unreasonable searches and seizures in violation of the Fourth Amendment and is therefore unconstitutional. Harvey argues that the wealth and influence of Southwestern Bell, its extensive regulation by the federal government, its strong interest in obtaining wire fraud convictions, and its regular commission of wire interception are sufficient to vest it with governmental authority. He further suggests that Southwestern Bell acted as a *de facto* agent of the Federal Bureau of Investigation in conducting the monitoring of his telephone line.

While a private party may be held to assume a governmental nature such as to render its acts violative of the Constitution, *see, e. g., Marsh v. Alabama,* 326 U.S. 501, 507–09, 66 S.Ct. 276, 90 L.Ed. 265 (1946), there is no basis in the record for concluding that Southwestern Bell is clothed with an essentially governmental function of the type necessary to support such a holding. Moreover, no evidence was presented which indicated that prior to September 17, 1974, the day Handloser first contacted the FBI, he or any other Southwestern Bell security official acted with prior knowledge, acquiescence, or encouragement of the FBI or any other government agency. *See United States v. Clegg,* 509 F.2d 605, 609–10 (5th Cir. 1975). *See also United States v. Glanzer,* 521 F.2d 11, 12 (9th Cir. 1975).

search warrant other than to specify that it must be issued "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *See also* Fed.R.Crim.P. 41(c). The affidavit of Agent Matthews set forth substantial information establishing clear probable cause to believe that a device emitting a 2600 cycle tone and Southwestern Bell multifrequency tones was being utilized by James Harvey at his residence, and Harvey does not contend otherwise.

■ As to the specificity of the affidavit, it must be remembered that the affidavit in support of the issuance of a search warrant must be interpreted in accordance with the dictates of common sense and not by the hindsight application of technical requirements. *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Haefeli v. Chernoff*, 526 F.2d 1314, 1319 (1st Cir. 1975); *United States v. Rahn*, 511 F.2d 290, 292 (10th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). Neither the Southwestern Bell officials nor the FBI agents knew the actual physical form which the device would take, and it is apparent that they assumed that it would be in the form familiar to their research and experience: the plastic box described by Matthews in his affidavit. *See Government of Virgin Islands v. Gereau*, 502 F.2d 914, 930 (3d Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *Quigg v. Estelle*, 492 F.2d 343, 345–46 (9th Cir.), *cert. denied*, 419 U.S. 848, 95 S.Ct. 86, 42 L.Ed.2d 78 (1974); *United States v. Rytman*, 475 F.2d 192, 193 (5th Cir. 1973); *Ballew v. United States*, 389 F.Supp. 47, 56–57 (D.Md.1975). The cassette tapes constituted "an electronic device that allows a caller to make long distance phone calls without them being recorded for billing by the telephone company" and were thus properly seized as within the limitations of the warrant.

■ The search of the residence also disclosed a "black box", a device which is constructed for the sole purpose of deceiving the billing equipment of telephonic communication carriers.[11] The "black box" was in plain view of the agents and its seizure satisfied the requirements set forth in *United States v. Williams*, 523 F.2d 64, 66 (8th Cir. 1975) *cert. denied*, 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976):

> [T]he seizure was therefore not unreasonable if (1) the officers had made a lawful entry into the [residence], (2) the discovery was inadvertent, and (3) the incriminating nature of the [object] was "immediately apparent". *Coolidge v. New Hampshire*, 403 U.S. 443, 464–73, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). *See also Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

We therefore hold that the District Court properly overruled the motion to suppress

---

11. As Special Agent Robert Mann, a member of the radio engineers section of the FBI laboratory in Washington, D.C., testified at trial:

Q Now tell us what the purpose of that device would be?

A The device actually is placed on the incoming side of the line or the incoming phone and it serves no purpose whatsoever except to indicate to the telephone company billing equipment that an incoming call has gone unanswered.

This device will draw enough current to allow the phone to be answered but the ringing will continue, and by operating the switch momentarily you can knock the ring off without indicating to the telephone company billing equipment that the call has been answered. A search of their records would indicate this is an unanswered call.

\* \* \* \* \* \*

THE COURT: Does it have any purpose or use—I think purpose is the wrong word—any use or any legitimate purpose that you can think of?

THE WITNESS: Not that I know of, Your Honor.

\* \* \* \* \* \*

THE COURT: \* \* \* Now can you think of any other function or use other than, in effect, deceiving the instrumentation of the telephone company in the instrument used for billing purposes?

THE WITNESS: No, Your Honor, I can't.

The operation of a "black box" to subvert the billing system of a telephonic communication carrier is a violation of 18 U.S.C. § 1343.

based upon the alleged violation of the scope of the search warrant.

### III.

■ Harvey's two remaining contentions are without merit. First, no prejudice was shown from the reading of the indictment by the District Court as a part of its instructions, a practice which is within its sound discretion. *See United States v. Polizzi*, 500 F.2d 856, 876 (9th Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975); *United States v. Goldberg*, 455 F.2d 479, 480 (9th Cir.), *cert. denied*, 406 U.S. 967, 92 S.Ct. 2411, 32 L.Ed.2d 665 (1972).

■ Second, we find no error in the District Court's denial of Harvey's post-trial motions. These motions essentially alleged that a FBI 302 statement to Agent Matthews by Handloser was "newly discovered" evidence of perjury by Handloser that had been knowingly suppressed by the prosecution. Any inconsistency between Handloser's testimony and the FBI 302 report of his statement during investigation was readily discoverable at time of trial because the 302 statement was in evidence. We find no evidence of suppression or the knowing use of perjured testimony by the government and, indeed, the District Court's finding that Handloser's testimony was not perjurious is well supported by the evidence.[12]

The judgment of conviction is affirmed.

---

12. Since we hold that the District Court properly overruled the motion for a renewed evidentiary hearing, there is no basis for Harvey's further contention of error resulting from the overruling of his motion for continuance of sentencing pending such a hearing.