Herman D. BRANDON, Appellant,

v.

UNITED STATES of America,
Appellee.

Sylvester E. GAUTREAUX, Jr.,
Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 9395, 9396.

United States Court of Appeals
Tenth Circuit.

Aug. 29, 1967.

608

John M. Amick, Oklahoma City, Okl., for appellants.

David A. Kline, First Asst. U. S. Atty., Oklahoma City, Okl. (B. Andrew Potter, U. S. Atty., Oklahoma City, Okl., on the brief), for appellee.

Before WILBUR K. MILLER, Senior Circuit Judge,* and BREITENSTEIN and HILL, Circuit Judges.

WILBUR K. MILLER, Senior Circuit Judge:

On April 29, 1966, a grand jury in the District Court for the Western District of Oklahoma returned a multi-count indictment against Thomas E. McCay, Glenn S. Danford and the appellants, Herman D. Brandon and Sylvester E. Gautreaux, Jr. The first count accused them of conspiracy to commit offenses against the United States.[1] The count alleged that the specific crimes which the indictees were accused of conspiring to commit were the transmission, by wire and radio communication in interstate commerce, of certain sounds and signals in furtherance of a preconceived scheme to defraud Southwestern Bell Telephone Company of revenue for the use of long distance telephone service and facilities, in violation of 18 U.S.C. § 1343.[2]

It was part of the conspiracy, count one alleged, that the indictees would acoustically connect to various telephone lines an electronic device which would conceal the existence of long distance calls made by the conspirators, thereby preventing the telephone company from billing them for such calls. Twenty-two overt acts in furtherance of the conspiracy were charged. Each of the remaining 46 counts of the indictment accused one of the conspirators of a specifically described unlawful use of an electronic device for the purpose indicated, in violation of 18 U.S.C. § 1343. Nine of these counts were laid to the appellant Brandon and five to the appellant Gautreaux.

On August 8, 1966, when the cases were called, McCay and Danford pleaded *nolo contendere*, but Brandon and Gautreaux stood on their pleas of not guilty and went to trial. They did not take the

---

* Of the United States Court of Appeals for the District of Columbia Circuit, sitting by designation.

1. In violation of 18 U.S.C. § 371, which is, in pertinent part, as follows:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. That section is as follows:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

stand and offered no evidence in defense of the charges against them. Both were found guilty on August 10, 1966, not only under the conspiracy count, but also under the various other counts which applied to them. On October 27, 1966, the trial judge reserved imposition of sentences and placed Brandon and Gautreaux on probation for three years; nevertheless, they appeal.

The Government's evidence showed that in February, 1965, one Lewis G. McKenzie demonstrated to Brandon and Gautreaux at his laboratory in California an electronic device referred to as a "black box," which McKenzie later admitted under cross-examination "could be used to circumvent the telephone company's billing equipment" and which was manufactured by him "under-cover." At the appellants' request, McCay and Danford joined them in California and the four purchased the "black box." It was taken to Oklahoma and used there by the conspirators until it was seized by agents of the Federal Bureau of Investigation in the execution of a search warrant covering the office of the appellants.

Early in 1965, officials of the telephone company became suspicious when its accounting department reported that a "computer print out" showed numerous calls of long duration placed to universal information numbers[3] throughout the United States from a limited number of telephones. Because of this, the telephone company's Security Supervisor for Oklahoma, where the suspected telephones were located, proceeded to monitor the lines in question at intervals from April, 1965, to January, 1966.

It is unnecessary, we think, to undertake a technical description of the monitoring devices and the method of their operation. Suffice it to say the monitoring process revealed that long distance calls from the suspected numbers—which were those used by the appellants—were being placed in such a manner as to avoid the telephone company's billing equipment. Tape recordings of the monitored long distance conversations were made, and later were taken to the grand jury, pursuant to subpoena; they became the bases of the substantive counts of the indictment.

The appellants do not challenge or contradict the evidence introduced by the Government. Instead, they substantially admit its accuracy by making in their brief the following Statement of Facts:

"Lewis McKenzie, a witness for the government, manufactured a device which, by the emission of tones of various fixed frequencies, enabled a telephone user to dial a distant telephone without actuating the telephone company's automatic billing equipment. There was evidence that the defendants had acquired the device in California, and both defendants had used the device to make long distance calls.

"The telephone company eventually became aware that something irregular was occurring, and constructed a rather elaborate device which enabled their security agents to monitor four suspected lines. This device was placed in operation and calls made from the suspected lines were intercepted, broadcast over a loudspeaker and recorded on tape. (These included a number of calls made by each defendant.) Excerpts from these tapes were used in evidence against the defendants at the trial."

In attempted avoidance of the damaging facts thus admitted, appellants argue the convictions should be reversed because of two propositions thus stated: (1) "The indictment does not allege, nor did the evidence prove an offense against the United States;" and (2) "Evidence acquired by the Government in violation

3. These universal information numbers may be called from any place in the United States in order to obtain the telephone number of any subscriber within their respective areas. Obviously, a normal call to a universal information number lasts only a very short time.

of 47 U.S.C.A. 605 [4] should have been excluded and the failure to do so was highly prejudicial to the defendants."

■■ In support of the first of these propositions, the appellants make the following statements:

" * * * (1) no false representation was ever made by any of these defendants to the telephone company; (2) the telephone company was never deceived with regard to any of the calls alleged in the substantive [counts]; the company was aware of the time the calls began, from where the calls originated, to whom the calls were made, and the length of time the calls lasted; (3) the telephone company did not suffer any monetary loss nor did any of the defendants experience any financial gain as a result of the sending of the signals; (4) it was never shown that any of the defendants knew whether or not their alleged fraudulent scheme was, in fact, working or whether they would at the end of the month be billed for the calls."

In a case such as this, it is not necessary for the Government to allege and prove that a false representation was made by the defendant to the victim; nor that the latter was actually deceived. Huff v. United States, 301 F.2d 760, 765 (5th Cir.), cert. denied 371 U.S. 922, 9 L.Ed. 2d 230 (1962). Neither is it essential that the telephone company suffer financial loss, nor that the defendant reap financial gain, although in this case these results did in fact occur.

It is obvious from the language of § 1343 that the Fifth Circuit was correct in saying in the *Huff* case, supra:

"There is no requirement that the victim be actually deceived, but only that there be a scheme to defraud, and that the telephone be used as a step in the execution of the scheme. * * "

Thus, it clearly appears that the appellants' first proposition upon which they rely for reversal and their arguments in support of it border on the frivolous.

■■ Their second proposition, based on an alleged violation of 47 U.S.C. § 605 by the telephone company, is equally without logical foundation. It is, as Judge Mehrtens suggested,[5] contrary to common sense. In the first place, one who directly dials a distant number impliedly agrees that the telephone company

4. That section is as follows:
"No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, or to a person employed or authorized to forward such communication to its destination, or to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, or to the master of a ship under whom he is serving, or in response to a subpena issued by a court of competent jurisdiction, or on demand of other lawful authority; and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; and no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto; and no person having received such intercepted communication or having become acquainted with the contents, substance, purport, effect, or meaning of the same or any part thereof, knowing that such information was so obtained, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of the same or any part thereof, or use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto; *Provided*, That this section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication broadcast, or transmitted by amateurs or others for the use of the general public, or relating to ships in distress."

5. United States v. Hanna, 260 F.Supp. 430 (D.C.Fla.1966).

may use the means necessary to ascertain where the call originated, the number called, and the duration of the conversation, in order that the proper charge may be recorded. Ordinarily this is done by automatic equipment, but if by mishap or fraud the billing equipment is inoperative, the telephone company unquestionably has the right to get the necessary information through the intervention of a human agency.

■■ One who directly dials honestly and innocently would have no objection to this procedure if mishap should disable the automatic billing equipment; and one who fraudulently by-passes the billing mechanism has no legal standing to attack any reasonable procedure the telephone company takes to protect itself. It seems to us, therefore, that the appellants' reliance on § 605 of the Communications Act is clearly misplaced. That provision was adopted by Congress for the protection of authorized users of telephonic or radio facilities; it was not intended as a refuge for the wrongdoer who uses the telephone in a scheme to violate the wire fraud statute.

■ Indeed, § 605 provides for a situation such as this. Its prohibition against the divulging of a message by a communications medium does not, by express terms of the section, forbid disclosure "to a person employed or authorized to forward such communication * * * to proper accounting or distributing officers of the various communicating centers over which the communication may be passed * * * or in response to a subpena issued by a court of competent jurisdiction * * *."

The appellants urge that "[T]he users of all the telephones in the case were never shown to be unauthorized users but, on the contrary, may be presumed to have been perfectly lawfully entitled to use the telephones used." This is a specious argument; it is plain that the appellants, although subscribers, were not authorized to use their telephones for the purpose of circumventing the billing equipment and so violating the wire fraud statute.

As far as we know, this is a case of first impression at the appellate level involving a prosecution under § 1343 where the communications medium itself was the victim of the fraud. Such a situation was considered, however, by the District Courts in Georgia and Florida in United States v. Beckley, 259 F.Supp. 567 (D.C. Ga.1965); and United States v. Hanna, supra. These cases involved questions similar to those we have discussed, and both courts reached the same conclusions with respect to them which we have expressed here.

Affirmed.