# MICHAEL LEE SMITH *v.* STATE OF MARYLAND

[No. 98, September Term, 1977.]

*Decided July 14, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ., and reargued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.

*Howard L. Cardin* for appellant.

*Stephen B. Caplis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Mary Ann Willen, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court. DIGGES, ELDRIDGE and COLE, JJ., dissent. ELDRIDGE, J., filed a dissenting opinion in which DIGGES, J., concurs at page 174 *infra.* COLE, J., filed a dissenting opinion at page 178 *infra.*

Whether electronically obtained evidence was improperly admitted at the appellant Smith's criminal trial in violation of state law and the federal constitution is the central issue in this case.

Smith was charged with having robbed Patricia McDonough on March 5, 1976. Evidence adduced at the trial showed that the victim was returning to her home shortly after midnight on the morning of the crime when she observed a man in her neighborhood changing a tire on a 1975 Monte Carlo automobile which had a dark green bottom and a tan top. As Miss McDonough approached her home, she was suddenly grabbed from behind and her pocketbook forcibly

taken from her. In the course of the robbery, the victim had a full-face view of the robber and promptly gave Officer Kenneth Lucas a description of her assailant and of the 1975 Monte Carlo automobile.

Shortly after the crime was committed, Miss McDonough received a threatening and obscene telephone call from an individual who identified himself as the person who had robbed her. She thereafter received a series of such calls from the robber and so advised the police. Unknown to the police, a friend of Miss McDonough, Walt Heline, had attached a recording device to her telephone and instructed her how to tape the robber's conversation when he called. After Miss McDonough taped three or four calls from her assailant, she informed the police that she had recorded the conversations, and eventually gave the tapes to them.

In the meantime, on March 13, at the request of the police, the telephone company, at its central office, installed terminating accounting equipment on the victim's telephone line in an effort to determine the origin of the calls she was receiving from the robber. As a result, it was ascertained that some of the calls were being made from pay phones in the immediate vicinity of the victim's home. Earlier, the victim had advised the police that she thought one of the calls had been made from a telephone at a private residence.

On March 15, Miss McDonough received a call from the robber requesting that she step out on her porch so that he could see her. She did so and observed the 1975 Monte Carlo which she had earlier described to the police, driving slowly by her home.

Officer Lucas, to whom the victim had originally reported the crime, was on the lookout for a man fitting the description of the robber and of the described vehicle. On March 16, in the general vicinity of the victim's home, the appellant Smith stopped Lucas and sought his assistance in opening the locked door of his 1975 Monte Carlo. Lucas took the license number of the vehicle, learned that it was registered to the appellant Smith, and so notified other investigating police officers.

On March 17, the telephone company, at the request of the

police, installed a pen register [1] at its central offices to record the phone numbers of calls made from the telephone at Smith's residence. On March 17, a call was made from Smith's residence to the victim's home. The police thereafter obtained a search warrant to search Smith's automobile and residence. The search of the residence revealed that a page in Smith's telephone book was turned down; it contained the name and number of the victim. On March 19, the victim viewed a six-man line-up at police headquarters and identified the appellant Smith as the man who robbed her.

In pretrial motions, Smith had sought to suppress the evidence obtained by the tape recordings and the pen register; he also moved to suppress the line-up identification. He contended that the attachment of the recording device to the victim's telephone without a court order violated Maryland Code (1957, 1976 Repl. Vol.) Art. 27, § 125A (a); under that section, it is a misdemeanor "for any person in this State to use any electronic device . . . to overhear or record any part of the conversation or words spoken to or by any person in private conversation without the knowledge or consent . . . of that other person." He also contended that the recording device attached to the victim's phone violated Code (1974), § 10-402 of the Courts and Judicial Proceedings Article; that section prohibits a person from obtaining "the whole or any part of a telephonic . . . communication to which the person is not a participant by means of a device . . . unless consent is given by the participants." Appellant further contended that the evidence resulting from the installation of the pen register should be suppressed because its obtention was based on information gleaned from the unlawful tape recordings of the telephone conversations. He also argued

---

1. A pen register was well described by Justice Powell in United States v. Giordano, 416 U. S. 505, 94 S. Ct. 1820, 40 L.Ed.2d 341 (1974), as follows:

"A pen register is a mechanical device attached to a given telephone line and usually installed at a central telephone facility. It records on a paper tape all numbers dialed from that line. It does not identify the telephone numbers from which incoming calls originated, nor does it reveal whether any call, either incoming or outgoing, was completed. Its use does not involve any monitoring of telephone conversations. . . ." 416 U. S. at 549.

that the pen register constituted an unlawful "interception" of a telephonic communication forbidden by § 10-402 of the Courts Article. He furthermore maintained that, absent a court order or search warrant, the use of the pen register constituted an illegal search and seizure in contravention of the fourth amendment to the federal constitution. Finally, Smith argued that without the illegally obtained electronic evidence he would not have been arrested, required to appear in a line-up and identified by the victim. He therefore claimed that the line-up identification should also be suppressed, but he withdrew this contention before the trial judge acted on his motions.

The trial judge overruled the motions to suppress, and the electronically obtained evidence was admitted. Smith was found guilty of robbery and sentenced to ten years in prison. We granted certiorari prior to decision by the Court of Special Appeals to review the important issues raised in the case.

### (1)

### The Tape Recorded Telephone Conversations

At the trial, the State conceded that the recording of the telephone conversations violated § 125A of Art. 27. It maintained that the tape recordings were nevertheless admissible in evidence because the only sanction prescribed by the statute was criminal prosecution of those who violate its provisions. The Court of Special Appeals so held in *Reed v. State,* 35 Md. App. 472, 372 A. 2d 243 (1977), and *Pennington v. State,* 19 Md. App. 253, 310 A. 2d 817 (1973), *cert. denied,* 271 Md. 742, *cert. denied,* 419 U. S. 1019 (1974). The appellant does not challenge that interpretation of the statute, and we therefore have no occasion to consider the question in this case.

Appellant claims instead that the attachment to the victim's phone of the recording device without a court order constituted an illegal "interception" of a telephonic communication in contravention of § 10-402 of the Courts Article.

Until its repeal by ch. 692 of the Acts of 1977,[2] § 10-402 was part of the Maryland Wire Tapping Act, §§ 10-401 through 10-408 of the Courts Article, in effect at the time of the appellant's arrest and prosecution. That Act declared in § 10-401 that the right of the people to be secure against "unreasonable interception of telephonic . . . communications may not be violated." It expressed the legislative mandate that the "interception and divulgence of a private communication by any person not a party thereto is contrary to the public policy of the state, and may not be permitted except by court order in unusual circumstances to protect the people." Section 10-402 (a) makes it unlawful, absent a court order, for any person to obtain a telephonic communication to which he is not a participant by means of any device unless consent is given by the participants. Section 10-406 provides that evidence obtained in violation of the Maryland Wire Tapping Act is inadmissible in court.

The appellant relies on *Robert v. State,* 220 Md. 159, 151 A. 2d 737 (1959), as authority for the exclusion of the tape recordings under § 10-402 (a). In *Robert,* police officers, anticipating that the defendant would make a phone call to certain friends in a motel, positioned themselves at the motel's telephone switchboard. When the expected call came through the switchboard, the officers monitored it by means of a headset connected through a press key to the switchboard. After observing that the officers could not be classified as participants in the conversation, and that they overheard it without the consent of all of the participants, our predecessors held that the headset was an electrical device by which the officers obtained the telephone conversation in contravention of the Act's provisions, rendering the evidence thereby obtained inadmissible in court.

---

2. Chapter 692 repealed the Maryland Wire Tapping Act and Art. 27, § 125A; in its place it enacted a new statute comprehensively regulating the interception of wire and oral communications. The new statute became effective on July 1, 1977 and is codified as Maryland Code (1974, 1977 Cum. Supp.) §§ 10-401 through 10-412. The Act closely parallels Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520. Both the state and federal statutes make it unlawful, with certain exceptions, to intercept "any wire or oral communication," as those terms are therein defined, and each contains a provision making all evidence obtained in violation of the statute inadmissible in court.

162

*Robert* is plainly inapposite on its facts. There, the police officers were not participants in the conversation. In the present case, Miss McDonough was a participant in the conversations which she recorded. There is no requirement in § 10-402 (a) that consent to the recording must be given by all participants in the conversation. Consequently, there was no violation of § 10-402 (a), although plainly the recording of the conversations violated Art. 27, § 125A. *Cf. Clark v. State,* 2 Md. App. 756, 237 A. 2d 768 (1968), *cert. denied,* 394 U. S. 1001 (1969).

Appellant's suggestion that it was Heline and not the victim who recorded the conversations is not supported by the record. Nor is there any evidence to support Smith's claim that in attaching the recording device to the victim's phone Heline acted as a police agent. Simply because the police learned, after the fact, that the device had been attached to the victim's phone, but did not require its removal, does not warrant a finding that § 10-402 (a) was violated. Finally, there is no justification for Smith's reliance on *Commonwealth v. McCoy,* 442 Pa. 234, 275 A. 2d 28 (1971), and *Cameron v. State,* 365 P. 2d 576 (Okla. 1961), to establish that § 10-402 (a) was violated by the recording of the conversations; the statutes involved in those cases were markedly different from § 10-402 (a) and therefore are not applicable in this case.

(2)

## *The Pen Register*

We find no merit in the argument that the installation of the pen register at the central offices of the telephone company to record the phone numbers of outgoing calls made from Smith's residence telephone constituted the "interception" of a telephonic communication in violation of § 10-402 (a).

The Supreme Court held in *United States v. New York Telephone Co.,* 434 U. S. 159, 98 S. Ct, 364, 54 L.Ed.2d 376 (1977), that a pen register is not encompassed within the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520. That Act, which

comprehensively regulates wiretapping and electronic surveillance, requires a court order authorizing or approving the interception of a wire or oral communication. The term "intercept" is defined in § 2510 (4) of the statute to mean "the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device." The Supreme Court said that pen registers are not within the statute because they are not devices used to intercept oral or wire communications, *i.e.,* they do not "intercept" because they do not acquire the "contents" of a communication, as that latter term is defined in § 2510 (8). The Court said:

> "Indeed, a law enforcement official could not even determine from the use of a pen register whether a communication existed. These devices do not hear sound. They disclose only the telephone numbers that have been dialed — a means of establishing communication. Neither the purport of any communication between the caller and the recipient of the call, their identities, nor whether the call was even completed are disclosed by pen registers. Furthermore, pen registers do not accomplish the 'aural acquisition' of anything. They decode outgoing telephone numbers by responding to changes in electrical voltage caused by the turning of the telephone dial (or the pressing of buttons on push button telephones) and present the information in a form to be interpreted by sight rather than by hearing." 98 S. Ct. at 369-70.

Although the verbiage of § 10-402 (a) differs from the federal statute, the prohibitions underlying each law require the "interception" of a communication. We conclude, as did the Supreme Court in *New York Telephone,* and most federal courts which have considered the question,[3] that a pen

---

3. *See, e.g.,* United States v. Illinois Bell Tel. Co., 531 F. 2d 809 (7th Cir. 1976); United States v. Southwestern Bell Telephone Co., 546 F. 2d 243 (8th Cir. 1976); United States v. Falcone, 505 F. 2d 478 (3rd Cir. 1974), *cert. denied,* 420 U. S. 955 (1975).

register is not a device which "intercepts" a telephonic communication. Accordingly, the use of the pen register did not violate § 10-402 (a).

Since the evidence procured by recording the telephone conversations which the victim had with her assailant was properly admitted at the trial, Smith's alternative argument that the pen register evidence must be suppressed as an illegal derivative use of the recorded telephone conversations is also lacking in merit. *Cf. Everhart v. State,* 274 Md. 459, 337 A. 2d 100 (1975); *Carter v. State,* 274 Md. 411, 337 A. 2d 415 (1975).

Appellant next contends that pen register surveillance constitutes a search subject to the warrant requirements of the fourth amendment. Since no warrant or court order was obtained authorizing the installation of the pen register, Smith claims that the evidence which the pen register produced, and all evidence derived from its use, must be suppressed. The State, on the other hand, contends that the better-reasoned cases support the view that pen register surveillance is not a search within the fourth amendment and that a warrant is not required to install such a device. Substantial authority exists for each position.

In *Katz v. United States,* 389 U. S. 347, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court held that evidence obtained without a warrant by government agents of words spoken by the defendant in a telephone conversation, which the agents overheard by attaching an electronic listening device to the outside of a public telephone booth from which the defendant had placed a telephone call, violated the fourth amendment. It held, overruling *Olmstead v. United States,* 277 U. S. 438, 48 S. Ct. 564, 72 L. Ed. 944 (1928), that the fourth amendment governs not only the seizure of tangible items, but also the recording of oral statements overheard, even in the absence of a technical trespass against local property law. It said that the fourth amendment protects people, and not merely places, against unreasonable searches and seizures; that it protects "individual privacy against certain kinds of governmental intrusion"; that what a person knowingly exposes to the public, even in his own home or

office, is not a subject of fourth amendment protection; but that what he seeks to preserve as private may be constitutionally protected. The Court said that while the fourth amendment cannot be translated into a general constitutional right to privacy, the activities of the government agents violated "the privacy upon which [the defendant] justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." 389 U. S. at 353.

The admissibility of evidence obtained by use of a pen register was considered in *United States v. Giordano,* 416 U. S. 505, 94 S. Ct. 1820, 40 L.Ed.2d 341 (1974). There, court orders had been issued authorizing interception of wire communications and the installation of a pen register, and these orders were subsequently extended. The application to extend the pen register detailed the contents of conversations intercepted pursuant to the wire interception orders. The Court held that the wire interception orders were invalid since they had not been authorized in conformity with the controlling federal statute. It further held that evidence gathered under the pen register extension order was inadmissible because tainted by the use of the unlawfully intercepted wire communications to secure judicial approval to extend the pen register surveillance order. The Court did not hold that use of a pen register requires compliance with the warrant requirements of the fourth amendment, although that result might be implied in view of the decision to exclude the evidence which the pen register produced.

In a concurring and dissenting opinion by Justice Powell, in which the Chief Justice and Justices Blackmun and Rehnquist joined, it was pointed out that there was no dispute that the pen register order was based on probable cause and lawful under the fourth amendment. In this context, Justice Powell stated: "Because a pen register device is not subject to the provisions of Title III, the permissibility of its use by law enforcement authorities depends entirely on compliance with the constitutional requirements of the Fourth Amendment." 416 U. S. at 553-554. That Justice Powell would not have decided the constitutional issue is, however, clear

from his further statement, appearing at footnote 4, 416 U. S. at 554: "The Government suggests that the use of a pen register may not constitute a search within the meaning of the Fourth Amendment. I need not address this question, for in my view the constitutional guarantee, assuming its applicability, was satisfied in this case." Justice Powell concluded that the pen register extension order was valid, because based only in part on the unlawfully intercepted wire communications, and that the evidence gathered by the device was admissible.

Relying on Justice Powell's statement to support the proposition that the use of a pen register depends on compliance with the requirements of the fourth amendment, the court in *Application of U.S. in Matter of Order, Etc.,* 538 F. 2d 956 (2nd Cir. 1976), stated at 959: "We take this statement to mean that a pen register order involves a search and seizure under the Fourth Amendment, and that a court may issue such an order only upon a showing of probable cause." A number of other courts have reiterated Justice Powell's statement concerning pen registers and compliance with the fourth amendment. *See United States v. Illinois Bell Tel. Co.,* 531 F. 2d 809 (7th Cir. 1976); *United States v. Doolittle,* 507 F. 2d 1368 (5th Cir.), *cert. dismissed,* 423 U. S. 1008 (1975); *United States v. John,* 508 F. 2d 1134 (8th Cir.), *cert. denied,* 421 U. S. 962 (1975); *United States v. Brick,* 502 F. 2d 219 (8th Cir. 1974). Although each of these cases states that the propriety of the use of a pen register depends upon compliance with the fourth amendment, only *Application of U.S. in Matter of Order, Etc.* holds that the use of a pen register constitutes a search; indeed, in *United States v. John, supra,* the court held that it was not necessary to decide that question. In all four of these cases a warrant had in fact been issued, and none of them address the question whether use of the device constitutes a search.

Nor did the Supreme Court decide the question in *United States v. New York Telephone Co., supra.* It said, 98 S. Ct. at 369: "The Court of Appeals [4] held that pen register

---

4. *See* Application of U.S. in Matter of Order, Etc., *supra.*

surveillance was subject to the requirements of the Fourth Amendment. This conclusion is not challenged by either party, and we find it unnecessary to consider the matter."

In *New York Telephone,* the government had obtained a court order, which the telephone company resisted, authorizing the installation of a pen register and directing the telephone company to provide facilities and assistance necessary to install it. At issue in the case was not whether a warrant was necessary; one had been obtained. Rather, the primary issue was whether the District Court had the power to issue an order authorizing pen register surveillance. The Court held that it had such authority under Fed. R. Crim. P. 41 (b) which was sufficiently broad to encompass a search, not limited to tangible items but including electronic intrusions, designed to ascertain the use being made of a telephone. The Court did not hold that the fourth amendment required such an order; it merely said that the District Court had the authority to issue the order.

Under *Katz,* whether pen register surveillance requires compliance with the fourth amendment depends on whether a telephone subscriber has a constitutionally protected expectation that the numbers which he dials will remain private. In determining whether an expectation of privacy is constitutionally justified, we adopted in *Venner v. State,* 279 Md. 47, 367 A. 2d 949 (1977), *cert. denied,* 431 U. S. 932 (1977), the twofold test articulated by Justice Harlan in his concurring opinion in *Katz, i.e.,* "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' " 389 U. S. at 361. Other courts have followed this test. *See, e.g., United States v. Peterson,* 524 F. 2d 167 (4th Cir. 1975), *cert. denied,* 423 U. S. 1088 (1976); *United States v. Hitchcock,* 467 F. 2d 1107 (9th Cir. 1972), *cert. denied,* 410 U. S. 916 (1973); *Smith v. State,* 510 P. 2d 793 (Alas.), *cert. denied,* 414 U. S. 1086 (1973); *People v. Huddleston,* 38 Ill. App. 3d 277, 347 N.E.2d 76 (1976).

It is generally held that the expectation of privacy protected by the fourth amendment attaches to the content of a telephone conversation and not to the fact that a

168

conversation took place. *Hodge v. Mountain States Tel. & Tel. Co.,* 555 F. 2d 254 (9th Cir. 1977); *United States v. Clegg,* 509 F. 2d 605 (5th Cir. 1975); *United States v. Baxter,* 492 F. 2d 150 (9th Cir.), *cert. dismissed,* 414 U. S. 801 (1973); *United States v. Fithian,* 452 F. 2d 505 (9th Cir. 1971); *United States v. Harvey,* 394 F. Supp. 228 (E.D. Ark. 1975) *aff'd* 540 F. 2d 1345 (8th Cir. 1976). *Clegg* dealt with a device in all respects similar to a pen register; it was attached by the telephone company to the defendant's telephone line to determine whether he was illegally circumventing the telephone company's billing system by using a so-called "blue box" device to make long-distance calls. The court there said that the fourth amendment "protects only the content of a telephone conversation and not the fact that a call was placed or that a particular number was dialed." 509 F. 2d at 610. This was so, the court said, "because telephone subscribers have no reasonable expectation that records of their calls will not be made . . . [since it is] well known that such records are kept." *Id.* at 610. Consistent with *Clegg,* other courts have held that telephone subscribers have no reasonable expectation that records of their calls will not be made. *United States v. Harvey,* 540 F. 2d 1345 (8th Cir. 1976); *DiPiazza v. United States,* 415 F. 2d 99 (6th Cir. 1969), *cert. denied,* 402 U. S. 949 (1971); *United States v. Covello,* 410 F. 2d 536 (2nd Cir.), *cert. denied,* 396 U. S. 879 (1969); *Nolan v. United States,* 423 F. 2d 1031 (10th Cir. 1969), *cert. denied,* 400 U. S. 848 (1970); *Brandon v. United States,* 382 F. 2d 607 (10th Cir. 1967); *Baxter, supra; Fithian, supra.* These cases in the main involve billing records for toll or long-distance phone calls. They seemingly stand for the proposition that, as against the subscriber's claim to privacy, the fourth amendment is not applicable to the seizure of such records in the possession of the telephone company because public awareness that the records are routinely maintained negates any constitutionally protected expectation of privacy regarding them.

In *Hodge v. Mountain States Tel. & Tel. Co.,* 555 F. 2d 254 (9th Cir. 1977), the court held that no substantive fourth amendment right was implicated by the warrantless attachment of a pen register to the telephone line of a

subscriber suspected of making local obscene calls. In concluding that no constitutionally protected right of privacy was involved, the court saw little practical difference, insofar as public awareness was concerned, between the maintenance of routine telephone billing records and a pen register. It said:

> "Although a pen register record differs from telephone company billing records, we have no difficulty in now holding that the information recorded is not protected by the Fourth Amendment.
>
> "A pen register record for a particular telephone contains information different from the telephone company billing records for that telephone. Telephone company billing records show only completed calls, not, as with a pen register, the numbers dialed. Furthermore, a pen register record shows the dialing of telephone numbers which, even if completed, would not be shown by billing records, because the numbers are within a local dialing area. It could be argued that since no records of such calls are normally maintained, an expectation of privacy exists. This admitted difference is not, in our view, of constitutional dimension [6] and is more than offset by the fact that pen register records are even farther removed than billing records from the content of the communications. Viewed in the round, the information recorded by pen registers is not entitled to Fourth Amendment protection."

"6. The existence of a constitutional right should not depend upon the boundaries established by the telephone company for its local calling areas." 555 F. 2d at 256-257.

Judge Hufstedler, in an opinion specially concurring in *Hodge,* said that the use of the pen register did not constitute a "search" within the meaning of the fourth amendment "because the 'electronic listening' does not encroach upon 'the privacy upon which . . . [one] justifiably relie[s]' " citing *Katz.* 555 F. 2d at 266. After noting that there was no justifiable

expectation of privacy in the contents of telephone company billing records, she said:

> "Similarly, there is no expectation of privacy in the contents of a pen register tape. Like billing records, a pen register tape discloses the numbers dialed from a particular telephone and not the contents of any conversation. In fact, a pen register creates a lesser intrusion into a subscriber's privacy because, unlike billing records, a pen register tape does not indicate whether any calls were answered.
>
> "True, the telephone company usually does not keep a record of local telephone calls. But most subscribers are unaware of the boundaries of their local dialing zones, especially in cities where these zones do not coincide with traditional geographic boundaries. Furthermore, it is common practice for the telephone company to keep a record of all calls dialed from a telephone which is subject to a special rate structure.... Under these circumstances, subscribers do not harbor any justifiable expectation of privacy that a record will not be kept of their outgoing calls.... ('... For this reason, the acquisition ... by means of a pen register ... of nothing more than information concerning ... the numbers dialed does not offend the Fourth Amendment.')." *Id.* at 266.

The same conclusion was reached in Note, *The Legal Constraints Upon the Use of the Pen Register as a Law Enforcement Tool,* 60 Cornell L. Rev. 1028, 1044-45 (1975). It was there said:

> "[T]he fourth amendment does not bar the use of the pen register. First, even assuming that a privacy expectation is in fact present, it is well settled that toll calls (and their records) are not entitled to a reasonable expectation of privacy. And, with respect to most areas of the country, there seems to be no valid distinction between the expectations associated with local calls on the one hand and those calls that

cross the local billing zone on the other hand. The majority of subscribers probably have no real knowledge as to the geographic boundaries of their 'local call' zone."

A second reason for the commentator's conclusion that warrantless pen register surveillance does not violate the fourth amendment was stated as follows:

"[A]ll telephone subscribers must utilize equipment owned by a third party, the telephone company, in order to place a call. It is therefore unreasonable for a subscriber to assume that the fact of his call passing through the telephone system will remain a total secret from the telephone company. Once this assertion is accepted, it is clear that there can be no reasonable expectation of privacy from law enforcement authorities with respect to the dial pulses detected and recorded by the telephone company. In a variety of analogous contexts, the **Supreme Court has determined that a person** entitled to receive a communication is similarly entitled to reveal it to government officials without further legal process." *Id.* at 1045.

Supportive of the conclusion that pen register surveillance does not violate the fourth amendment is *United States v. White,* 401 U. S. 745, 91 S. Ct. 1122, 28 L.Ed.2d 453 (1971), and *United States v. Miller,* 425 U. S. 435, 96 S. Ct. 1619, 48 L.Ed.2d 71 (1976). In *White,* statements made by the defendant were overheard by government agents by means of a hidden transmitter which an informer agreed to wear during his meetings with the defendant. The Court found no constitutionally protected expectation of privacy that the informant would not simultaneously transmit the conversation to the police. In *Miller,* the Court held that a bank depositor had no legitimate expectation of privacy in the contents of checks and deposit slips turned over to the bank, stating:

"The depositor takes the risk, in revealing his affairs to another, that the information will be

conveyed by that person to the government. . . . This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." 425 U. S. at 443.

A similar situation exists in the case of telephone calls. While the content of a call is not revealed to the telephone company, the information as to the number dialed must necessarily be revealed, since it is through telephone company switching equipment that calls are completed. As a recipient of such information, the company may reveal it since the caller can have no reasonable expectation that it will remain private. In fact, the caller should have even less of a justified expectation of privacy, since unlike the disclosures in *White* and *Miller* the use of a pen register does not reveal the contents of a communication.

Cases involving other types of surveillance are also relevant. In *United States v. Hufford,* 539 F. 2d 32 (9th Cir.), *cert. denied,* 429 U. S. 1002 (1976), the court held that the installation of an electronic tracking device on a drum of caffeine to aid government agents in tracking the defendant's truck did not violate the fourth amendment. Citing *Katz,* the court stated: "[The defendant] did not have a reasonable expectation of privacy as he drove along the public road. While he hoped that his travel would go unmonitored, his movements were knowingly exposed to the public, and therefore are not a subject of fourth amendment protection." 539 F. 2d at 33-34. *Accord: United States v. Pretzinger,* 542 F. 2d 517 (9th Cir. 1976). *Contra: United States v. Holmes,* 521 F. 2d 859 (5th Cir. 1975), *aff'd by an evenly divided court,* en banc 537 F. 2d 227 (1976).

The use of mail covers, where postal inspectors copy information contained on the outside of sealed envelopes traveling through the mail, may also be likened to the use of

a pen register. In each situation, communications travel through public conveyances; in each the surveillance reveals the destination or point of origin of the communications, but not the content of the message itself. If anything, the use of a mail cover is more of an invasion of privacy than a pen register since the mail cover reveals the identities of the parties. Nonetheless, courts have generally held that the use of mail covers does not violate the fourth amendment. *See Lustiger v. United States,* 386 F. 2d 132 (9th Cir. 1967), *cert. denied,* 390 U. S. 951 (1968); *Canaday v. United States,* 354 F. 2d 849 (8th Cir. 1966). Post-*Katz* authority upholding the use of mail covers is limited. *See United States v. Leonard,* 524 F. 2d 1076 (2d Cir. 1975), *cert. denied,* 425 U. S. 958 (1976) (mail cover on international mail); *United States v. Balistrieri,* 403 F. 2d 472 (7th Cir. 1968); *United States v. Isaacs,* 347 F. Supp. 743 (N.D. Ill. 1972). In *United States v. Choate,* 422 F. Supp. 261 (C.D. Cal. 1976), the court took a contrary view. While it recognized that a person's expectation of privacy with respect to return addresses on mail is a limited one, the court concluded that a person justifiably expects that the information will be used only for postal purposes and that records of it will not be kept. The court held a person did have a reasonable expectation that his mail would not be used for surveillance purposes. The holding in *Choate* may be questioned, however, in light of *United States v. Miller, supra,* where the Supreme Court held that disclosure of information, even on the assumption that it would be used for a limited purpose, negated any expectation of privacy with respect to that information.

We hold that there is no constitutionally protected reasonable expectation of privacy in the numbers dialed into a telephone system and hence no search within the fourth amendment is implicated by the use of a pen register installed at the central offices of the telephone company. While the guarantees of the fourth amendment are broad, they are not boundless, *State v. Siegel,* 266 Md. 256, 292 A. 2d 86 (1972); not everything a person may want to be private is protected by the fourth amendment. As *Katz* teaches, the fourth amendment does not afford our citizens "a general

constitutional right to privacy." In not imposing Title III restrictions on the use of pen registers, it is evident, as *New York Telephone* explicitly points out, that the Congress did not consider that such devices pose a threat to privacy of the same dimension as the interception of an oral communication. As the Supreme Court noted in that case, pen registers do not reveal whether a communication existed and it recognized that such devices are regularly used by the telephone company without a court order "for the purposes of checking billing operations, detecting fraud, and preventing violations of law." 98 S. Ct. at 373. The intrusion involved in pen register surveillance is minimal; no violation of the integrity of the communication system itself is entailed; and no conversation is overheard.

Whether a telephone subscriber harbors an actual subjective expectation of privacy in the numbers which he dials is, of course, difficult to know. In all probability, he understands that his calls are placed through mechanical equipment and that some record is made. We think it unlikely that the telephone subscriber distinguishes between local or toll calls with respect to an expectation of privacy in the numbers he dials. Even if he did harbor such an expectation, we are not prepared to say on the record before us that it is one that society would recognize as reasonable and constitutionally protected.

> *Judgment affirmed; costs to be paid*
> *by appellant.*

*Eldridge, J., dissenting* :

Although I recognize that the issue is a close one, I do not share the majority's view that there is no reasonable expectation of privacy in the numbers dialed into a telephone system. Consequently, I disagree with the majority's conclusion that no search within the meaning of the Fourth Amendment is implicated by the police's having a pen register installed to record the numbers dialed from the telephone at the defendant's home.

In *Katz v. United States,* 389 U. S. 347, 88 S. Ct. 507, 19

L.Ed.2d 576 (1967), the Supreme Court held (389 U. S. at 353, emphasis supplied):

> "The Government's activities in electronically listening to and recording the petitioner's words *violated the privacy upon which he justifiably relied while using the telephone booth* and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment."

In my opinion, there similarly exists a privacy upon which one justifiably relies with respect to the telephone numbers which he dials in his own home.

Mr. Justice Harlan both joined the majority opinion in *Katz* and further explained the applicable principles in a concurring opinion, stating (389 U. S. at 361):

> "As the Court's opinion states, 'the Fourth Amendment protects people, not places.' The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a 'place.' My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable."

As pointed out in the above quotation, "for most purposes" a person expects privacy in his own home. I know of no sound basis for concluding that there is an exception to this general proposition in regard to telephone numbers which a person

dials on his home telephone. It is not like a conversation "in the open." When the average person dials a number in the privacy of his home, he does not contemplate, nor should he reasonably contemplate, that he is exposing the information "to the 'plain view' of outsiders."

The principles set forth by the majority and by Mr. Justice Harlan in *Katz* lead me to the conclusion that the Fourth Amendment does apply when the police have a pen register installed to record the numbers dialed from one's telephone. The same conclusion has been reached by several cases in the United States Courts of Appeal. *Application of United States For Order, Etc.,* 546 F. 2d 243, 245 (8th Cir. 1976), *cert. denied, Southwestern Bell Telephone Company v. United States,* 434 U. S. 1008, 98 S. Ct. 716, 54 L.Ed.2d 750 (1978); *Application of U. S. In Matter of Order, Etc.,* 538 F. 2d 956, 959 (2d Cir. 1976), *reversed on other grounds, United States v. New York Tel. Co.,* 434 U. S. 149, 98 S. Ct. 364, 54 L.Ed.2d 376 (1977); *United States v. Illinois Bell Tel. Co.,* 531 F. 2d 809, 813 (7th Cir. 1976); *United States v. John,* 508 F. 2d 1134, 1141 (8th Cir. 1975), *cert. denied,* 421 U. S. 962, 95 S. Ct. 1948, 44 L.Ed.2d 448 (1975); *United States v. Falcone,* 505 F. 2d 478, 482 n. 21 (3d Cir. 1974), *cert. denied,* 420 U. S. 955, 95 S. Ct. 1339, 43 L.Ed.2d 432 (1975).

The principal basis for the view that the use of a pen register does not constitute a search for purposes of the Fourth Amendment seems to be the conclusion of some judges that there is no justifiable expectation of privacy with respect to numbers dialed because "[t]elephone subscribers are fully aware that records will be made of their toll calls." *United States v. Baxter,* 492 F. 2d 150, 167 (9th Cir. 1973), *cert. denied,* 416 U. S. 940, 94 S. Ct. 1945, 40 L.Ed.2d 292 (1974). *See also Hodge v. Mountain States Tel. & Tel. Co.,* 555 F. 2d 254, 256, 266 (9th Cir. 1977); *United States v. Clegg,* 509 F. 2d 605, 610 (5th Cir. 1975). This theory is relied on by the majority in the instant case.

However, the mere fact that a person who thinks about it would realize that the numbers dialed in *completed* long distance calls would have to be recorded for billing purposes, does not, in my judgment, warrant the conclusion that no

reasonable expectation of privacy exists generally with respect to telephone numbers dialed. Such calls represent only a small percentage of those made by the average individual. The overwhelming majority of calls made by the average person are local and do not involve toll charges. Moreover, as to calls outside of one's local area, many are not answered or result in busy signals. Nevertheless, the pen register records even these. Because one's expectation of privacy in a particular type of situation may not be fully realized in a minority of instances does not necessarily make that expectation unreasonable.

The majority's attempted analogy between *United States v. Miller,* 425 U. S. 435, 443, 96 S. Ct. 1619, 48 L.Ed.2d 71 (1976), and the situation in the instant case is unpersuasive. In *Miller,* with regard to checks and deposit slips, the Supreme Court observed that the "depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the government." But it was not the telephone company which instigated the installation of the pen register in the instant case. *Miller* is thus distinguishable by the fact that here, absent the government's intrusion, the telephone company *could* not have revealed any information to the government regarding Smith's calls. Normally the telephone company does not, in any meaningful sense, possess information about local telephone calls which it could pass on. The mere fact that machines (switching equipment) owned by the telephone company responded in certain ways to the defendant's dialing numbers cannot reasonably be construed as a transfer of information by the defendant to the telephone company. There is no indication in this case that the telephone company's machinery preserved a record of the numbers dialed, nor that any telephone company employee did or could be expected to observe the process. The defendant, by the simple act of dialing local numbers, did not reasonably intend to reveal information; he merely made use of machinery in particular ways which, without the police intrusion, would have remained fully private.

In sum, I agree with the position suggested by Mr. Justice Powell, dissenting in part in *United States v. Giordano,* 416 U. S. 505, 548, 553-554, 94 S. Ct. 1820, 1842, 1845, 40 L.Ed.2d 341 (1974), that the permissibility of law enforcement officials using a pen register depends upon compliance with the requirements of the Fourth Amendment.

Judge Digges has authorized me to state that he concurs with the views expressed herein.

*Cole, J., dissenting* :

> Today no one perhaps notices because only a small, obscure criminal is the victim. But every person is the victim, for the technology we exalt today is everyman's master.

> Mr. Justice Douglass, dissenting in *United States v. White,* 401 U. S. 745, 757, 91 S. Ct. 1122, 28 L.Ed.2d 453 (1971).

The majority holds today that the installation of a pen register, by the telephone company, at the request of the police and without the authorization of a warrant, at its central office to record all numbers dialed from the defendant's telephone, does not constitute a search under the fourth amendment because "there is no constitutionally protected reasonable expectation of privacy in the numbers dialed into a telephone system."

I disagree and I respectfully dissent.

The issue of whether the use of a pen register is a search and must therefore comply with the standards of the fourth amendment is one of first impression in this jurisdiction. Heretofore, this Court has only addressed the question of whether government electronic interception of a conversation is a search. *E.g., Carter v. State,* 274 Md. 411, 337 A. 2d 415 (1975); *Siegel v. State,* 266 Md. 256, 292 A. 2d 86 (1972); *Trovinger v. State,* 34 Md. App. 357, 367 A. 2d 548 (1977); *Pennington v. State,* 19 Md. App. 253, 310 A. 2d 817 (1973), *cert. denied,* 419 U. S. 1019 (1974); *State v. Graziano,* 17 Md. App. 276, 301 A. 2d 36 (1973). The pen register alone does not record "conversations," nor whether a call was completed; it

only records the fact that certain numbers were dialed from a telephone. The question actually before us, then, is whether police interception of the *information* from Smith's telephone (certain numbers dialed) by means of a pen register, was a "search." [1]

A "search" in the constitutional sense has three components: it is (1) an invasion into otherwise private or concealed areas or matters (2) by the government (3) exploring for evidence of guilt in a criminal prosecution. *See von Lusch v. State,* 39 Md. App. 517, 387 A. 2d 306 (1978); *Minnick v. State,* 4 Md. App. 81, 241 A. 2d 153 (1968); *Kleinbart v. State,* 2 Md. App. 183, 234 A. 2d 288 (1967). Other courts have adopted similar definitions of the term "search." *See, e.g., United States v. Lisk,* 522 F. 2d 228 (7th Cir. 1975), *cert. denied,* 423 U. S. 1078 (1976); *United States v. Davis,* 482 F. 2d 893 (9th Cir. 1973); *Marshall v. United States,* 422 F. 2d 185 (5th Cir. 1970); *State v. Tully,* 166 Conn. 126, 348 A. 2d 603 (1974); *State v. Ashby,* 245 So. 2d 225 (Fla. 1971); *Alcorn v. State,* 255 Ind. 491, 265 N.E.2d 413 (1970); *State v. Person,* 34 Ohio Misc. 97, 298 N.E.2d 922 (1973); *State v. Cundy,* 201 N.W.2d 236 (S.D. 1972), *cert. denied,* 412 U. S. 928 (1973); *Long v. State,* 532 S.W.2d 591 (Tex. Crim. App. 1975), *cert. denied,* 425 U. S. 937 (1976). Especially concise is the definition in *Davis, supra,* at 896-97:

> '[S]earch is a functional, not merely a physical, process.' *Lustig v. United States,* 338 U. S. 74, 78, 69 S. Ct. 1372, 1374, 93 L. Ed. 1819 (1949). A search begins with the planning of the invasion and continues 'until effective appropriation' of the fruits of the search 'for subsequent proof of an offense.'

---

1. Two federal circuits have held that use of a pen register constitutes a search. *See* United States v. Southwestern Bell Telephone Company, 546 F. 2d 243 (8th Cir. 1976); Application of U.S. in Matter of Order, 538 F. 2d 956 (2d Cir. 1976), rev'd on other grounds, sub nom. United States v. New York Telephone Co., 434 U. S. 159, 98 S. Ct. 364, 54 L.Ed.2d 376 (1977). Dicta from other circuits endorse the views of Mr. Justice Powell in United States v. Giordano, 416 U. S. 505, 94 S. Ct. 1820, 40 L.Ed.2d 341 (1974) (concurring and dissenting opinion). *See* United States v. Illinois Bell Tel. Co., 531 F. 2d 809 (7th Cir. 1976); United States v. John, 508 F. 2d 1134 (8th Cir.), cert. denied, 421 U. S. 962 (1975); United States v. Falcone, 505 F. 2d 478 (3d Cir. 1974), cert. denied, 420 U. S. 955 (1975).

*Id.* The Fourth Amendment applies to a search whenever the government participates in any significant way in this total course of conduct. 'The decisive factor . . . is the actuality of a share by a[n] . . . official in the total enterprise of securing and selecting evidence by other than sanctioned means.'

A "search," therefore, is a step in a criminal investigation by the government which focuses on the gathering of *information* or clues relevant to prosecution.

Information is not restricted to the contents of oral communication. In many situations non-verbal action may be more explicit and highly relevant to a criminal investigation. Such signals may be a command to bet or not to bet, to print or not to print, to preserve or to destroy, or indeed, to stay or flee. It is only left to the investigator to understand the question being answered. I agree with the majority that conversation is protected under the teachings of *United States v. Katz,* 389 U. S. 347, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967). However, information received from monitoring Smith's telephone is also entitled to protection. Technologically, a distinction between verbal and digital transmissions is absurd. There can be no doubt that the fact that Smith made certain calls from his home telephone is highly relevant information in a criminal prosecution for obscene or annoying phone calls.

The "government action" part of the definition of a "search" is satisfied in Smith's case because the telephone company attached the pen register to Smith's line at the request of the police and was not ordered to do so by a court or acting under compulsion of a warrant. In essence, the telephone company, not conducting an independent investigation of its own, assumed the role of an agent of the government in conducting a warrantless search. The majority cites cases which on this point are inapposite. The surveillance of the defendants' telephones in *Hodge v. Mountain States Tel. & Tel. Co.,* 555 F. 2d 254, 256 n. 3 (9th Cir. 1977); *United States v. Harvey,* 540 F. 2d 1345 (8th Cir. 1976); *United States v. Clegg,* 509 F. 2d 605 (5th Cir. 1975); *Nolan v. United States,* 423 F. 2d 1031 (10th Cir. 1969); *cert. denied,* 400 U. S. 848

(1970); and *Brandon v. United States,* 382 F. 2d 607 (10th Cir. 1967) was conducted solely by the telephone companies, independent of government agencies.[2] Furthermore, in *United States v. Baxter,* 492 F. 2d 150 (9th Cir.), *cert. dismissed,* 414 U. S. 801 (1973); *DiPiazza v. United States,* 415 F. 2d 99 (6th Cir. 1969), *cert. denied,* 402 U. S. 949 (1971); and *United States v. Covello,* 410 F. 2d 536 (2d Cir.), *cert. denied,* 396 U. S. 879 (1969), no pen registers or blue boxes were ever used; government agencies merely subpoenaed the toll or long distance billing records routinely kept by the telephone company. *United States v. Fithian,* 452 F. 2d 505 (9th Cir. 1971), also involved the exercise of governmental power to subpoena telephone company records rather than governmental or telephone company surveillance of the making of calls, although the opinion is unclear as to whether the documents recorded local or toll calls, or both.[3]

The "invasion of privacy" prong of the definition of a "search" is also met in this case. While telephone companies routinely maintain records of toll and long distance calls for billing purposes, or monitor a telephone line to correct problems with services, or deal with customer complaints, local calls made by Smith on his home phone are a private matter. Routine telephone company activities do not include the monitoring of local calls because customers usually pay for basic use of equipment at a flat rate. Nor would the government routinely be privy to information concerning Smith's private local calls absent a warrant.

---

2. Although not cited by the majority in this case, two other recent Ninth Circuit decisions specifically excluded fourth amendment considerations because monitoring activities were conducted by telephone companies, independent of the government. *See* United States v. Bowler, 561 F. 2d 1323 (9th Cir. 1977); United States v. Glanzer, 521 F. 2d 11 (9th Cir. 1975) (per curiam).

3. In the case *sub judice* the police obtained information about *all* of Smith's outgoing calls, not just long-distance or toll calls, as in Baxter, DiPiazza, and Covello, *supra.* The majority attempts to minimize the significance of these factual distinctions by quoting a portion of Hodge, *supra,* in which, without citing any authority other than its own opinion, the Ninth Circuit stated that the difference between a pen register's recording of all attempted outgoing telephone calls and a telephone company's routine records of completed toll and long distance calls is not of constitutional dimension. *See* Hodge, *supra,* 555 F. 2d at 256-57 and n. 6.

The majority contends that a legal distinction between telephone customer expectations regarding local calls and toll calls cannot be made because subscribers have no real knowledge as to the geographic boundaries of their local calling area. This amounts to mere speculation as to what the average telephone customer knows. In addition, in Maryland, a person using the telephone must have some knowledge of his local calling zone because a special number prefix, "1," must be dialed in order just to complete in-state calls which are made to telephones outside one's local calling zone. It is also difficult to agree with this argument because it assumes that telephone subscribers are so unconcerned about the amount of their monthly bills that they pay no attention to whether they are making toll calls.

Second, the majority suggests that since all telephone calls must pass through equipment owned by the telephone company, the telephone company will have knowledge of the fact that calls were made. The majority then attempts to construct an analogy between the facts in this case and prior cases holding that transfer of information to the government by a "wired" informant, *United States v. White, supra,* or by a bank, *United States v. Miller,* 425 U. S. 435, 96 S. Ct. 1619, 48 L.Ed.2d 71 (1976), or by means of "mail covers" *e.g., United States v. Leonard,* 524 F. 2d 1076 (2d Cir. 1975), *cert. denied,* 425 U. S. 958 (1976), or by observation in a public area, *e.g., United States v. Hufford,* 539 F. 2d 32 (9th Cir.), *cert. denied,* 429 U. S. 1002 (1976), did not violate the fourth amendment because those defendants had no constitutionally protected expectations of privacy when they gave information to the person(s) who ultimately turned the information over to the government.

This analogy just does not hold water. In *White, supra,* a conversation between the defendant and an informant was relayed by the informant to the police by means of an electronic transmitter that the informant was wearing. The majority opinion in *White* stressed that because the revelation to the government was made by a "party" to conversation with the defendant, the defendant had no justifiable or constitutionally protected expectation of privacy concerning

the conversation. 401 U. S. 745 at 749. I cannot agree that the telephone company in this case was a "party" to Smith's calls in the same sense as the informant in *White*. Smith did not speak to the telephone company in the direct manner that White spoke to the informant. The telephone company was "neutral" in the telephone call. *See California Bankers Association v. Shultz,* 416 U. S. 21, 48-49, 94 S. Ct. 1494, 39 L.Ed.2d 812 (1974). Smith was leasing the telephone in order to make private calls from his home. If Smith had known that a pen register would be attached to his phone merely at the request of the police, without a warrant, he would have little reason to lease a "private" home phone. A home phone would afford him little more privacy than a public phone.

Similarly, in *Miller, supra,* the Supreme Court held that because the defendant's bank was a "party" to the instruments negotiated by the defendant, the bank's revelation of information about the defendant's accounts upon government subpoena did not implicate the fourth amendment. 425 U. S. 435 at 440. According to the Court, the defendant had no reasonable expectation of privacy in that situation. Once again, I cannot agree that the telephone company is a "party" to its customers' telephone conversations in the same sense in which a bank operates with regard to its customers' negotiable instruments, so as to render unreasonable Smith's expectation of privacy in the use of his home phone. Even if the majority's analogy to *Miller* is valid, (and I do not agree) and Smith should have expected that the telephone company could itself monitor his phone for billing purposes, to improve service to its customers, or to verify complaints, Smith nevertheless had a reasonable expectation that the telephone company would not, without the safeguards of appropriate legal process, act for the government in collecting information relevant to a criminal prosecution. *See California Bankers Association v. Shultz, supra,* 416 U. S. 21 at 52.

The majority's analogy to "mail covers" is also unconvincing. While use of the postal service involves essentially public facilities where any writing on the outside of an envelope or on a postcard can be easily read by postal

employees, telephones are placed in the home to provide privacy regarding the parties to and content of a conversation. The Supreme Court has repeatedly acknowledged the aura of privacy which surrounds activities in the home, as contrasted with "public" activities. *See, e.g., United States v. Martinez-Fuerte,* 428 U. S. 543, 561, 96 S. Ct. 3074, 49 L.Ed.2d 1116 (1976) (Fourth Amendment context). The decision in *Miller, supra,* does not preclude this type of analysis because the Court in *Miller* expressly based its decision on the assumption that the documents subpoenaed were not the respondent's "private papers." *Miller, supra,* 425 U. S. 435 at 440. Unlike Miller, who voluntarily gave information to another "party" to his commercial transactions, his bank, and never operated on the assumption that the information was private, defendant Smith sought to maintain his privacy regarding his phone calls by placing them in his home. In contrast to the majority, I believe that the use of "mail covers" is *less* of an invasion of privacy than a pen register. The address and return address on an envelope are easily visible to anyone handling it, while use of a home phone is designed to make telephone communications a much more private matter.

The same argument also shows the weakness of the majority's reference to observations made on a public highway by the police. Smith placed these calls on his home telephone precisely to avoid "knowingly exposing" information to the public, as did the defendants in *Hufford, supra,* and in *United States v. Moore,* 562 F. 2d 106 (1st Cir. 1977).

The ultimate issue to be resolved is whether the warrantless search through electronic detection placed upon Smith's telephone violated the Fourth Amendment. The test that must be applied is one of the reasonableness of the search:

> [T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'

*Katz, supra,* 389 U. S. 347 at 361; *Venner v. State,* 279 Md. 47, 52, 367 A. 2d 949, *cert. denied,* 421 U. S. 932 (1977).

While I would agree with the majority that it is difficult to know whether a telephone subscriber harbors an actual subjective expectation of privacy in the numbers which he dials, I would contend that the facts in this case clearly support an inference that Smith had an expectation of privacy in the local calls he made. As previously stated, a phone call placed in the home would demonstrate an expectation of privacy, in contrast to one placed from a public phone or a private phone located in someone else's home. In addition, the telephone company does not usually keep records of every local call for routine billing or service purposes. At the very least, Smith certainly had an expectation that the telephone company would not act as a government agent in monitoring his calls for purposes of a criminal investigation without appropriate legal process. That such expectation is reasonable seems undebatable.

Finally, the majority dismisses Smith's contention rather summarily by stating that "[e]ven if he did harbor such an expectation, we are not prepared to say on the record before us that it is one that society would recognize as reasonable and constitutionally protected." I emphatically disagree.

Not only is society prepared to recognize this expectation of privacy in the use of one's home telephone but society would welcome the fact that this Court would declare its recognition of the right and protect it. Stated differently, I do not believe anyone in our society would be surprised to learn that the police were illegally tapping phones, examining mail or otherwise engaging in unlawful snooping. However, they would be shocked to learn that this Court or any other court condoned, tolerated or put its stamp of approval on such practices.

The majority fails to give due weight to the impact of Watergate and its progeny, the recent revelations of illicit surveillance conducted by the F.B.I. upon activities of various civil rights, labor and political leaders, or indeed, the potential abuse to which the pen register may be put by police

authorities.[4] These factors and others have created an environment of distrust, fear and lack of confidence.

I believe society condemns any such unlawful practice and awaits the forces of good to restore the basic right of privacy which has been steadily eroded. I believe that each citizen still clings to the notion that while being deprived of his privacy, he still has the right to it and relies upon the courts to safeguard that privacy from warrantless intrusion.

Lest we forget, the heart of the fourth amendment is to protect citizens against every unjustifiable intrusion by the state upon their privacy, whatever the means employed. For the fourth amendment to remain viable, it must adjust to the times and afford protection against new forms of invasions of privacy, however sophisticated and whether they are generated through electronics or even advances in the psychic or related sciences.

In the instant case, no such intrusion was legal without proper review of a magistrate. I would recognize Smith's right of privacy and suppress the fruits of the warrantless search.

---

4. A pen register may be subject to abuse because it may be easily converted into a wiretap by attaching headphones or a tape recorder to appropriate terminals on the pen register unit. Newer models of pen registers have automatic voice actuated switches which can automatically turn a tape recorder on and off as the telephone is used. *See* Note, *Circumventing Title III, The Use of Pen Register Surviellance in Law Enforcement,* 1977 Duke L. J. 751, 759. The pen register also has the potential of inhibiting freedom of association. If pen register data were fed into a central computer on a widespread basis, patterns of acquaintances and dealings among a substantial group of people would be available to the government. *A. Miller, Assault on Privacy, supra.* at 43.